DAVID HENKIN            #6876
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawaiʻi  96813
Telephone No.:  (808) 599-2436
Fax No.:  (808) 521-6841
Email:  dhenkin@earthjustice.org
Attorneys for Plaintiffs in Civil No. 13-00684 SOM RLP

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAIʻI

| | | |
|---|---|---|
| CONSERVATION COUNCIL FOR HAWAIʻI, *et al.*, | ) ) | CIVIL NO. 13-00684 SOM RLP |
| | ) | PLAINTIFFS CONSERVATION |
| Plaintiffs, | ) | COUNCIL FOR HAWAIʻI, ANIMAL |
| | ) | WELFARE INSTITUTE, CENTER |
| v. | ) | FOR BIOLOGICAL DIVERSITY, |
| | ) | AND OCEAN MAMMAL |
| NATIONAL MARINE FISHERIES | ) | INSTITUTE'S MEMORANDUM IN |
| SERVICE, *et al.*, | ) | SUPPORT OF MOTION FOR |
| | ) | SUMMARY JUDGMENT; |
| Defendants. | ) | CERTIFICATE OF COMPLIANCE |
| | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| NATURAL RESOURCES DEFENSE | ) | CIVIL NO. 14- 00153 SOM RLP |
| COUNCIL, INC., *et al.*, | ) | (CONSOLIDATED CASE) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NATIONAL MARINE FISHERIES | ) | |
| SERVICE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................1

II.     STANDARD OF REVIEW .........................................................4

III.    NMFS VIOLATED THE MMPA ................................................6

        A.      The MMPA Seeks To Maintain Optimum Sustained
                Populations Of Marine Mammals. ..................................6

        B.      NMFS Arbitrarily Found "Negligible Impact." ..................9

IV.     NMFS VIOLATED THE ESA .....................................................19

        A.      NMFS Failed To Ensure Against Jeopardy. .....................22

                1.      Whales....................................................................23

                2.      Turtles. ...................................................................25

        B.      NMFS Authorized ESA Take In Excess Of MMPA Take. ...............29

        C.      NMFS's Take Statement For Turtles Is Invalid. .................30

V.      THE HSTT EIS VIOLATES NEPA ..........................................32

        A.      Failure To Analyze A True "No Action" Alternative. ..........34

        B.      Failure To Analyze Alternatives With Less Environmental
                Harm. .................................................................38

VI.     CONCLUSION.........................................................................44

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

Anderson v. Evans,
  371 F.3d 475 (9th Cir. 2004) ...............................................................7, 8, 15

Arizona Cattle Growers' Ass'n v. Salazar,
  606 F.3d 1160 (9th Cir. 2010) .......................................................................5

Arizona Cattle Growers' Ass'n v. U.S. Fish and Wildlife Service,
  273 F.3d 1229 (9th Cir. 2001) ...............................................................21, 30

Bennett v. Spear,
  520 U.S. 154 (1997).....................................................................................10

Bob Marshall Alliance v. Hodel,
  852 F.2d 1223 (9th Cir. 1988) .......................................................34, 35, 36, 43

Brower v. Evans,
  257 F.3d 1058 (9th Cir. 2001) ..................................................................6, 10

California v. Block,
  690 F.2d 753 (9th Cir. 1982) .......................................................................42

Center for Biological Diversity v. Bureau of Land Mgmt.,
  422 F. Supp. 2d 1115 (N.D. Cal. 2006)............................................................31

Center for Biological Diversity v. Department of the Interior,
  623 F.3d 633 (9th Cir. 2010) ..................................................................5, 6, 24

Center For Biological Diversity v. Kempthorne,
  588 F.3d 701 (9th Cir. 2009) .........................................................................9

Citizens to Pres. Overton Park v. Volpe,
  401 U.S. 402 (1971).......................................................................................5

**CASES (continued)**                                                  **Page(s)**

City of Carmel-by-the-Sea v. Department of Trans.,
 123 F.3d 1142 (9th Cir. 1997) ...............................................43

Conservation Northwest v. Rey,
 674 F. Supp. 2d 1232 (W.D. Wash. 2009) .........................................38

Conservation Northwest v. Sherman,
 715 F.3d 1181 (9th Cir. 2013) ...............................................38

Consolidated Salmonid Cases,
 688 F. Supp. 2d 1013 (E.D. Cal. 2010) ...........................................28

Consolidated Salmonid Cases,
 713 F. Supp. 2d 1116 (E.D. Cal. 2010) ............................................9

Consolidated Salmonid Cases,
 791 F. Supp. 2d 802 (E.D. Cal. 2011) ...........................................28

Dubois v. United States Dep't of Ag.,
 102 F.3d 1273 (1st Cir. 1996)...............................................38

Earth Island Inst. v. U.S. Forest Serv.,
 351 F.3d 1291 (9th Cir. 2003) ...............................................33

Greenpeace v. National Marine Fisheries Serv.,
 80 F. Supp. 2d 1137 (W.D. Wash. 2000) ......................................20, 25, 27, 29

Kern County Farm Bureau v. Allen,
 450 F.3d 1072 (9th Cir. 2006) ...............................................12, 19

Klamath-Siskiyou Wilderness Center v. Bureau of Land Managment,
 387 F.3d 989 (9th Cir. 2004) ...............................................36

Lands Council v. Powell,
 395 F.3d 1019 (9th Cir. 2005) ......................................32, 40, 43, 44

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
 463 U.S. 29 (1983).......................................................18, 24

iii

**CASES (continued)**                                                **Page(s)**

Muckleshoot Indian Tribe v. U.S. Forest Service,
177 F.3d 800 (9th Cir. 1999) ....................................................................39, 44

National Wildlife Federation v. National Marine Fisheries Serv.,
524 F.3d 917 (9th Cir. 2008) .....................................................................28, 29

Natural Resources Def. Council v. Daley,
209 F.3d 747 (D.C. Cir. 2000)............................................................................6

Natural Resources Def. Council v. Hodel,
865 F.2d 288 (D.C. Cir. 1988)..........................................................................43

Northwest Coal. for Alternatives to Pesticides v. Environmental Prot.
Agency,
544 F.3d 1043 (9th Cir. 2008) ......................................................................5, 6

Ocean Advocates v. Army Corps of Engineers,
402 F.3d 846 (9th Cir. 2005) .................................................................4, 5, 9

Ocean Mammal Institute v. Gates,
546 F. Supp. 2d 960 (D. Haw. 2008)................................................................35

Oregon Natural Resources Council v. Allen,
476 F.3d 1031 (9th Cir. 2007) ......................................................4, 30, 31, 32

Sierra Club v. Marsh,
816 F.2d 1376 (9th Cir. 1987) ..........................................................................20

Tennessee Valley Authority v. Hill,
437 U.S. 153 (1978)...........................................................................................19

Western Watersheds Project v. Rosenkrance,
2011 WL 39651 (D. Idaho Jan. 5, 2011) .........................................................35

Wild Fish Conservancy v. Salazar,
628 F.3d 513 (9th Cir. 2010) ............................................................................29

iv

## UNITED STATES CODE

5 U.S.C. § 706(2)(A) ..................................................................5

16 U.S.C. § 1361(1) ...................................................................7

16 U.S.C. § 1361(2) ...................................................................7

16 U.S.C. § 1362(9) ...................................................................7

16 U.S.C. § 1362(11) .................................................................7

16 U.S.C. § 1362(13) .................................................................2

16 U.S.C. § 1362(18)(B) ............................................................2

16 U.S.C. § 1362(18)(B)(ii) ......................................................10

16 U.S.C. § 1362(18)(C) ............................................................2

16 U.S.C. § 1362(18)(D) ............................................................2

16 U.S.C. § 1362(20) ..........................................................15, 18

16 U.S.C. § 1371(a) ...................................................................7

16 U.S.C. § 1371(a)(5)(A)(i)(I) ...........................................8, 14

16 U.S.C. § 1371(a)(5)(E)(i)(I) ..............................................14

16 U.S.C. § 1371(a)(5)(F)(i) ....................................................8

16 U.S.C. § 1386(a) .................................................................19

16 U.S.C. § 1386(a)(6) .............................................................15

16 U.S.C. § 1531(b) .................................................................19

16 U.S.C. § 1532(13) ...............................................................21

16 U.S.C. § 1532(19) .................................................................2

## UNITED STATES CODE (continued)           Page(s)

16 U.S.C. § 1536(a)(2)................................................................20, 21, 25

16 U.S.C. § 1536(b)(3)(A) ...................................................................20

16 U.S.C. § 1536(b)(4) ........................................................................21

16 U.S.C. § 1536(b)(4)(B) ...................................................................23

16 U.S.C. § 1536(b)(4)(C) ...................................................................29

16 U.S.C. § 1538(a)(1) .........................................................................21

42 U.S.C. § 4332(2)(C) ........................................................................33

## CODE OF FEDERAL REGULATIONS

40 C.F.R. § 1500.1(a).........................................................................32

40 C.F.R. § 1500.3..............................................................................34

40 C.F.R. § 1502.1 ...........................................................................4, 33

40 C.F.R. § 1502.8..............................................................................36

40 C.F.R. § 1502.14............................................................................33

40 C.F.R. § 1502.14(a).....................................................................33, 38

40 C.F.R. § 1502.14(b)........................................................................33

40 C.F.R. § 1502.14(d) ........................................................................34

40 C.F.R. § 1503.4(a)(2)......................................................................40

40 C.F.R. § 1503.4(a)(5)...................................................................40, 42

40 C.F.R. § 1506.3..............................................................................33

40 C.F.R. § 1506.3(a)..........................................................................44

50 C.F.R. § 216.102(a).....................................................................10, 18

vi

| CODE OF FEDERAL REGULATIONS (continued) | Page(s) |
|---|---|

50 C.F.R. § 216.103 ..................................................................8, 14

50 C.F.R. § 229.2 ......................................................................14

50 C.F.R. § 402.01(b) ...............................................................20

50 C.F.R. § 402.02 ....................................................................20

50 C.F.R. § 402.14(g)(8) ...........................................................21

50 C.F.R. § 402.14(h) ................................................................21

50 C.F.R. § 402.14(i)(1)(i) .........................................................21

50 C.F.R. § 402.14(i)(4) .............................................................30

50 C.F.R. § 402.16(a) .................................................................30

## FEDERAL REGISTER

46 Fed. Reg. 18,026 (Mar. 23, 1981)..................................34, 35

64 Fed. Reg. 28,800 (May 27, 1999) .........................................15

## LEGISLATIVE HISTORY

H.R. Rep. No. 92-707 (1971), reprinted in 1972 U.S.C.C.A.N. 4144......................7

H.R. Rep. No. 97-567 (1982), reprinted in 1982 U.S.C.C.A.N. 2807....................30

## OTHER AUTHORITIES

http://quickfacts.census.gov/qfd/states/00000.html ...................................1

http://www.convertunits.com/from/square+miles/to/square+nautical+miles...........1

I.      INTRODUCTION

In December 2013, the National Marine Fisheries Service ("NMFS") gave the U.S. Navy the green light to conduct extensive training and testing activities in a vast swath of the Pacific called the Hawaii-Southern California Training and Testing ("HSTT") Study Area.  The HSTT Study Area includes Navy ranges in Hawai'i and Southern California, as well as transit corridors linking them, encompassing an area larger than all fifty United States combined.  Navy-H170101-16.[1]  The study area is home to thirty-nine marine mammal species, several listed under the Endangered Species Act ("ESA"), as well as five ESA-listed sea turtle species.  NMFS-4079-85; NMFS-65185.

The Navy has conducted training and testing in the biologically rich HSTT Study Area for decades, but recently sought to increase its activities' intensity and scope during the period from December 2013 to December 2018.  Navy-H170162-211.  Navy plans include tripling use of its most powerful mid-frequency active

_____

[1] Record citations indicate which agency's record is referenced, followed by the Bates-stamp number.

Plaintiffs ask the Court to take judicial notice that the United States' land area is 3,531,905 square miles, which is less than the HSTT Study Area's more than 2.8 million square nautical miles of ocean.  See http://quickfacts.census.gov/qfd/states/00000.html; http://www.convertunits.com/from/square+miles/to/square+nautical+miles.

sonar (to nearly 60,000 hours over five years), a source so powerful a single "ping" can permanently damage the hearing of a marine mammal 100 yards away.  Navy-H170266; NMFS-37004.  In all, over five years, the Navy plans to emit over 500,000 hours of sonar, which has been implicated in mass strandings of marine mammals, including the 2004 stranding of up to 200 melon-headed whales on Kaua'i.  Navy-H72721-22, 72753; Navy-H151922-27; Navy-H170266-67.

The Navy also intends to use more than 260,000 bombs, missiles, mines and other explosives, which further threaten marine species.  Navy-H170269-72.  In 2011, a single demolitions exercise killed four dolphins off San Diego.  Navy-H170634.

Because HSTT activities threaten to kill and otherwise harm marine animals, the Navy sought incidental take authorization from NMFS under the Marine Mammal Protection Act ("MMPA") and ESA.  Navy-H154436; Navy-H179307.[2]

---

[2] The ESA defines "take" to include "harass, harm, … wound [or] kill."  16 U.S.C. § 1532(19).

Under the MMPA, "take" includes "to harass … or kill … any marine mammal."  Id. § 1362(13).

For military readiness activities, the MMPA defines "harassment" as:

(i)  any act that injures or has the significant potential to injure a marine mammal or marine mammal stock in the wild [Level A harassment]; or

2

NMFS determined that, over the next five years, HSTT activities would kill up to 155 marine mammals, permanently injure over 2,000 more, and inflict additional harm nearly 9.6 million times by disrupting vital behaviors such as migration, nursing, breeding, feeding, and sheltering.  NMFS-37032-36.[3]  Despite this staggering harm, NMFS concluded HSTT activities would have only "negligible impact" and issued regulations, and associated letters of authorization ("LOAs"), authorizing all take.  NMFS-37040-48; see also NMFS-433; NMFS-494; NMFS-65572; NMFS-65588.

Because HSTT activities harm ESA-listed animals, NMFS issued a biological opinion ("BiOp") addressing the Navy's activities and NMFS's MMPA approvals.  NMFS concluded HSTT activities would kill up to fifteen endangered whales and countless listed sea turtles, and would inflict harm tens of thousands of

---

(ii) any act that disturbs or is likely to disturb a marine mammal or marine mammal stock in the wild by causing disruption of natural behavioral patterns, including, but not limited to, migration, surfacing, nursing, breeding, feeding, or sheltering, to a point where such behavioral patterns are abandoned or significantly altered. [Level B harassment].

Id. § 1362(18)(B); see also id. § 1362(18)(C), (D).

[3] Due to increased HSTT activities and improved science about harm to marine mammals, take rose an order of magnitude from the prior five-year period. Navy-H00173393-94 (mortalities/permanent injuries increased from 120 to nearly 2,200; temporary injuries/harassment increased from fewer than 800,000 to nearly 9.6 million).

3

times.  NMFS-49652-61; NMFS-65460-69.  NMFS nonetheless found no species

would be jeopardized and authorized all take.  Id.

 Plaintiffs challenge NMFS's decisions, which fail adequately to protect

marine mammals and imperiled species, contravening congressional intent.

Plaintiffs also challenge the Navy's and NMFS's reliance on the Navy's

environmental impact statement ("EIS") for HSTT activities, which violates the

National Environmental Policy Act's ("NEPA's") command to "inform

decisionmakers and the public of the reasonable alternatives which would avoid or

minimize adverse impacts … ."  40 C.F.R. § 1502.1.[4]

II. STANDARD OF REVIEW

 Because the MMPA, ESA and NEPA do not prescribe their own standards

of review, the Administrative Procedure Act ("APA") governs.  Ocean Advocates

v. Army Corps of Engineers, 402 F.3d 846, 858 (9th Cir. 2005) (MMPA and

NEPA); Oregon Natural Resources Council ("ONRC") v. Allen, 476 F.3d 1031,

1036 (9th Cir. 2007) (ESA).  This Court shall "hold unlawful and set aside agency

action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise

---

[4] As set forth in the Bevington, Green, Liss, Pisciotta, Sakashita and Ziegler declarations, Plaintiffs seek to protect their organizational, and their members' individual, interests from injury.

4

not in accordance with law."  5 U.S.C. § 706(2)(A).  The Court considers whether

the agency considered the relevant factors and "articulated a rational connection

between the facts found and the choice made."  Ocean Advocates, 402 F.3d at 859

(citations omitted).

In applying APA standards, the Court must perform "thorough, probing, in-

depth review" of the agency's decision and the record.  Citizens to Pres. Overton

Park v. Volpe, 401 U.S. 402, 415 (1971); see also Northwest Coal. for Alternatives

to Pesticides ("NCAP") v. Environmental Prot. Agency, 544 F.3d 1043, 1052 n.7

(9th Cir. 2008) (review "must be sufficient for us to be able to comprehend the

agency's handling of the evidence cited or relied upon").  This Court may "defer to

an agency's decision that is fully informed and well-considered," but "need not

forgive a clear error of judgment."  Center for Biological Diversity v. Department

of the Interior, 623 F.3d 633, 641 (9th Cir. 2010).

Even where an agency with "technical expertise" acts "within its area of

competence," this Court "need not defer to the agency when the agency's decision

is without substantial basis in fact."  Arizona Cattle Growers' Ass'n v. Salazar, 606

F.3d 1160, 1163 (9th Cir. 2010).  The Ninth Circuit explains:

> The mere fact that an agency is operating in a field of its expertise
> does not excuse us from our customary review responsibilities. …
> [W]here the agency's reasoning is irrational, unclear, or not supported

by the data it purports to interpret, we must disapprove the agency's action.

NCAP, 544 F.3d at 1052 n.7; see also Brower v. Evans, 257 F.3d 1058, 1067 (9th Cir. 2001) ("The presumption of agency expertise can be rebutted when its decisions, while relying on scientific expertise, are not reasoned").

Courts "do not hear cases merely to rubber stamp agency actions." Natural Resources Def. Council v. Daley, 209 F.3d 747, 755 (D.C. Cir. 2000). "To play that role would be 'tantamount to abdicating the judiciary's responsibility under the [APA].'" Id. (citation omitted). Accordingly, the Ninth Circuit has "insisted that agencies support and explain their conclusions with evidence and reasoned analysis." Center for Biological Diversity, 623 F.3d at 648; see also id. at 650 (court "compelled not to defer … when an agency has acted arbitrarily and capriciously").

III.   NMFS VIOLATED THE MMPA

   A.   The MMPA Seeks To Maintain Optimum Sustained Populations Of Marine Mammals.

Congress enacted the MMPA out of concern "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a

6

result of man's activities." 16 U.S.C. § 1361(1).[5]  It declared "such species and

population stocks should not be permitted to diminish beyond the point at which

they cease to be a significant functioning element in the ecosystem of which they

are a part, and … should not be permitted to diminish below their optimum

sustainable population."  Id. § 1361(2).[6]  The MMPA has "a conservative bias

[built] into the legislation."  H.R. Rep. No. 92-707, at 15 (1971), reprinted in 1972

U.S.C.C.A.N. 4144, 4148.

    "To carry out these conservation objectives, the MMPA implements a

sweeping moratorium in combination with a permitting process to ensure that the

taking of marine mammals is specifically authorized and systematically reviewed."

Anderson v. Evans, 371 F.3d 475, 498 (9th Cir. 2004).  The MMPA prohibits the

"take" of marine mammals, unless the take falls within specific statutory

exceptions.  16 U.S.C. § 1371(a).  In limited circumstances, NMFS may authorize

_____

    [5] A "population stock" is "a group of marine mammals of the same species
or smaller taxa in a common special arrangement, that interbreed when mature."
Id. § 1362(11).

    [6] "Optimum sustainable population" means, "with respect to any population
stock, the number of animals which will result in the maximum productivity of the
population or the species, keeping in mind the carrying capacity of the habitat and
the health of the ecosystem of which they form a constituent element."  Id. §
1362(9).

the incidental, non-intentional take of marine mammals during periods of up to five consecutive years.  <u>Id.</u> § 1371(a)(5)(A)(i)(I).

Before authorizing incidental take for HSTT activities, NMFS must determine, <u>inter alia</u>, that "the total of such taking during each five-year (or less) period concerned will have a negligible impact on such species or stock."  <u>Id.</u>; <u>see also</u> <u>id.</u> § 1371(a)(5)(F)(i).  "Negligible impact" means "an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival."  50 C.F.R. § 216.103.

The Ninth Circuit examined "Congress's carefully selected language" – including provisions restricting authorized take to only negligible impacts – and concluded:

> Congress's concern was not merely with survival of marine mammals, though that is of inestimable importance, but more broadly with ensuring that these mammals maintain an "optimum sustainable population" and remain "significant functioning elements in the ecosystem."

<u>Anderson</u>, 371 F.3d at 498.  "The MMPA's requirements for taking are specifically designed to promote such objectives."  <u>Id.</u>

8

B.    NMFS Arbitrarily Found "Negligible Impact."

"A negligible impact finding is arbitrary and capricious under the MMPA

'… if the agency[, inter alia,] ... entirely failed to consider an important aspect of

the problem....'" Center For Biological Diversity v. Kempthorne, 588 F.3d 701,

710 (9th Cir. 2009) (citations omitted).  Here, NMFS authorized the Navy to inflict

harm on marine mammals nearly 9.6 million times over five years, including

killing up to 155 animals and permanently injuring over 2,000 more.  The agency

failed meaningfully to analyze whether that staggering level of death and injury

would adversely affect the annual rate of recruitment or survival of any of the

sixty-five stocks affected, contravening Congress's policy to eliminate take that

precludes stocks from maintaining their optimum sustainable populations.  See

Baird Decl. ¶¶ 10-23, 39.[7]  Instead, NMFS simply eyeballed the situation and

announced itself satisfied.  See NMFS-37036-40.

NMFS cannot lawfully give out licenses to kill, maim and otherwise harm

marine mammals in this cavalier manner.  See Ocean Advocates, 402 F.3d at 859

---

[7] Defendants cite Dr. Baird's research extensively in the HSTT EIS and BiOp.  See, e.g., Navy-H170856-59; NMFS-65477.  This Court may consider his declaration "for explanation of technical terms and complex subject matter beyond the Court's knowledge [and] to understand the agency's explanations, or lack thereof."  Consolidated Salmonid Cases, 713 F. Supp. 2d 1116, 1156 (E.D. Cal. 2010).

(courts "must not 'rubber-stamp' ... decisions that [we] deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute"). The MMPA requires NMFS to use "the best scientific evidence available" in making negligible impact determinations. 50 C.F.R. § 216.102(a). This requirement is designed "to ensure that the [MMPA] not be implemented haphazardly, on the basis of speculation or surmise." Bennett v. Spear, 520 U.S. 154, 176 (1997).[8]

NMFS acknowledges that, even for stocks that suffer only Level B harassment, "there are known avenues through which behavioral disturbance of individuals can result in population-level effects." NMFS-37036. By definition, Level B harassment causes marine mammals to abandon or significantly alter behaviors essential to survival. 16 U.S.C. § 1362(18)(B)(ii). NMFS's rule specifies:

> An estimate of the number of Level B harassment takes, alone, is not enough information on which to base an impact determination. In addition …, NMFS must consider other factors, such as the likely nature of any responses (their intensity, duration, etc.), the context of any responses (critical reproductive time or location, migration, etc.),

---

[8] While Bennett addresses the ESA's "best available data" requirement, "ESA case law provides insightful and analogous provisions and analysis" regarding the MMPA's best available science requirement. Brower, 257 F.3d at 1070.

as well as the number and nature of estimated Level A harassment takes, the number of estimated mortalities, and effects on habitat.

NMFS-37036.  Having identified specific factors relevant to reasoned negligible impact determinations, NMFS then failed to analyze them.

NMFS's conclusory "Species-Specific Analysis" fails to mention, much less analyze, the effects of over two million authorized takes on stocks of Guadalupe fur and Harbor seals; Bottlenose, Fraser's, Long-beaked common, Northern right whale, Pacific white-sided, Pantropical spotted, Risso's, Rough-toothed, Spinner and Striped dolphins; and Killer, Pygmy Killer, Short-finned pilot and Melon-headed whales.  NMFS-37037-40; see also NMFS-37043.  The record is similarly bereft of analysis.  The stocks NMFS overlooked include stocks for which NMFS authorized both Level A takes (Harbor seals and Long-beaked common, Northern right whale, Pacific white-sided, Pantropical spotted, Risso's and Spinner dolphins) and mortalities (Harbor seals and all dolphin stocks).  NMFS-37032-36. Despite NMFS's acknowledgement that valid negligible impact findings must consider "the number and nature of estimated Level A harassment takes [and] the number of estimated mortalities," NMFS failed to do so.  NMFS-37036.

NMFS's evaluation of HSTT activities' impacts on the few species mentioned by name in the "Species-Specific Analysis" was no more meaningful. NMFS's rule cites with approval a recent study by New et al. (2013), which

11

"developed a model to assess the link between feeding energetics of beaked whales … and their requirements for survival and reproduction."  NMFS-37036.  That study applies "a detailed mathematical model" to "explor[e] the … energetics, survival and reproduction" of numerous beaked whale species, including nine that HSTT activities harm.  NMFS-43839; see NMFS-43833; Baird Decl. ¶ 18.  It concludes that "even a small non-lethal disturbance that results in displacement of whales from preferred habitats could potentially impact a population," NMFS-43831, resulting in "demographic consequences," NMFS-43841, and notes the implications for "military activity in beaked whale habitat."  Id.

NMFS then failed to apply the model to determine whether the nearly one-half million disturbances to essential behaviors the Navy requested would likely cause "adverse effects on annual rates of recruitment or survival (i.e., population-level effects)" to the affected beaked whale stocks, precluding negligible impact determinations.  NMFS-37036; see also NMFS-37039, 37043; Baird Decl. ¶¶ 17-18.  While the MMPA does not require any particular model to evaluate effects, the "best available science" mandate prohibits NMFS from ignoring available information, particularly "available scientific evidence that is in some way better than the evidence [it] relies on."  Kern County Farm Bureau v. Allen, 450 F.3d 1072, 1080 (9th Cir. 2006) (citation omitted).  Having endorsed New et al.'s

12

detailed, mathematical model, NMFS was obliged to use it (or some other, similarly scientific methodology) to quantify and evaluate potential population-level effects on the stocks HSTT activities will harm.  Instead, NMFS relied solely on speculation and surmise, violating the "best available science" requirement. See Baird Decl. ¶ 11.

NMFS's failure to use the best science available is particularly glaring with respect to the fifty-one stocks – including eleven stocks of endangered whales – for which NMFS authorized a total of 155 lethal takes.  See NMFS-37032, 37034.  As NMFS noted bluntly in its BiOp, "Dead animals are no longer capable of contributing to the survival and recovery of the population or the species."  NMFS-49660.  "[D]epending on sex and maturity of the animal," killing individual marine mammals can have substantial population-level consequences.  NMFS-49637.  The key consideration is whether "individual animals would be expected to experience reductions in their current or expected future reproductive success."  NMFS-49370.  If so, NMFS would "expect those reductions to also reduce the abundance, reproduction rates, or growth rates (or increase variance in one or more of these rates) of the populations those individuals represent."  Id.

While marine mammal deaths from HSTT activities clearly have the potential to "adversely affect the species or stock through effects on annual rates of

13

recruitment or survival," precluding a negligible impact finding, NMFS failed to conduct meaningful analysis before authorizing 155 mortalities.  50 C.F.R. § 216.103.  NMFS's "Species-Specific Analysis" mentions these authorized mortalities in passing, but does not evaluate their consequences.  For example, NMFS notes it is authorizing, for the first time, fifteen large whale mortalities, but fails to address the fact that "[t]he death of a female of any of the large whale species would result in a reduced reproductive capacity of the population or species."  NMFS-49660; see also NMFS-37037.

NMFS had analytic tools available to evaluate mortalities in making negligible impact determinations, but failed to use them.  Baird Decl. ¶¶ 19-23.  In 1999, NMFS adopted criteria for negligible impact determinations for MMPA section 101(a)(5)(E) permits, which authorize incidental take for commercial fisheries.  Exh. 3.  Like section 101(a)(5)(A), which applies to the HSTT permit, section 101(a)(5)(E) allows fisheries-related incidental mortality and serious injury only if it "will have a negligible impact on [the affected] species or stock."  Compare 16 U.S.C. § 1371(a)(5)(A)(i)(I) with id. § 1371(a)(5)(E)(i)(I); see 50 C.F.R. §§ 216.103, 229.2 (same "negligible impact" definition applies).[9]

_____

[9] A "serious injury" is "any injury that will likely result in mortality."  50 C.F.R. § 229.2.

NMFS's 1999 criteria compare incidental mortality to that stock's "potential biological removal" ("PBR") level, which the MMPA defines as "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." 16 U.S.C. § 1362(20).[10] Because PBR is defined in terms of optimum sustainable population, keeping incidental mortality below PBR is vital to achieve Congress's goals in enacting the MMPA. See Anderson, 371 F.3d at 498. The 1999 criteria establish a bright-line rule: "If total fisheries related serious injuries and mortalities are greater than PBR, permits may not be issued." 64 Fed. Reg. 28,800, 28,801 (May 27, 1999).

Ignoring its own criteria, NMFS made negligible impact determinations for HSTT activities, even though authorized annual mortality exceeds PBR – often by an order of magnitude – for fifteen stocks, including four endangered stocks:

---

[10] PBR levels are published in NMFS's stock assessment reports ("SARs"). See id. § 1386(a)(6).

| Stock | PBR | Authorized Annual Mortality |
|---|---|---|
| Endangered fin whale, Hawai'i | 0.2 | 3 |
| Endangered sei whale, E. N. Pacific | 0.17 | 3 |
| Endangered sei whale, Hawai'i | 0.1 | 3 |
| Endangered sperm whale, CA/OR/WA | 1.5 | 3 |
| Bryde's whale, Hawai'i | 3.3 | 6 |
| Minke whale, CA/OR/WA | 2.0 | 6 |
| Bottlenose dolphin, California Coastal | 2.4 | 23 |
| Bottlenose dolphin, CA/OR/WA offshore | 5.5 | 17 |
| Bottlenose dolphin, O'ahu | 3.9 | 8 |
| Bottlenose dolphin, 4-Islands region | 1.3 | 8 |
| Bottlenose dolphin, Kaua'i/Ni'ihau | 1.3 | 8 |
| Bottlenose dolphin, Hawai'i Island | 0.9 | 8 |
| Spinner dolphin, Hawai'i Island | 6.9 | 8 |
| Spinner dolphin, O'ahu/4-Islands | 3.3 | 8 |
| Spinner dolphin, Kaua'i/Ni'ihau | 5.1 | 8 |

16

NMFS-37032, 37034 (mortalities); Navy-H159105, H159110, H159173, H159211,

H159216, H159234-36, H159245-48, H1591318, H1591321, H1591324 (PBRs).[11]

In developing the HSTT rule, NMFS was aware of, and expressed concerns

about, the Navy's requests for permission to kill marine mammals in excess of

PBR.  See, e.g., NMFS-38137-38; NMFS-42984-85; NMFS-42972; NMFS-42987.

Rather than openly vet the issue to ensure HSTT activities would not harm marine

mammals, NMFS buried it to avoid "bring[ing] it up as a major red-flag that draws

everyone's attention to the issue."  NMFS-43972.  Consequently, both the final

rule and the record are silent regarding how NMFS reconciled authorizing take far

above what the stocks can sustain with its duty to prevent non-negligible impacts.

An exchange between NMFS and the Navy regarding large whale

mortalities from vessel strikes is telling.  NMFS knew the Navy had requested six

mortalities annually and that the requested mortalities were well above PBR for

several stocks.  See NMFS-39779; NMFS-42972.  Instead of insisting on measures

to keep HSTT-related mortalities below the level NMFS itself had established as

having adverse, population-level effects (thereby satisfying its duty to authorize

only takes with negligible impacts), NMFS focused solely on getting "something

_____

[11] For the HSTT permit, NMFS used PBRs from the 2012 SARs.  NMFS-
37002.

17

in place should the Navy's mortality requests be reached." NMFS-39779. By the time the Navy kills six whales in one year, however, it would have already exceeded "the maximum number of animals, not including natural mortalities, that may be removed from [the] stock while allowing that stock to reach or maintain its optimum sustainable population," and, thus, would have already inflicted harm that, by definition, is non-negligible. 16 U.S.C. § 1362(20). NMFS never explained its rationale for authorizing that level of mortality, asserting baldly the "scope of impacts [was] analyzed to reach the negligible impact determination." NMFS-39779.

Because NMFS failed to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" its negligible impact determinations are arbitrary and capricious. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Moreover, NMFS's failure to apply its 1999 criteria to evaluate take in excess of PBR violated its duty to use "the best scientific evidence available." 50 C.F.R. § 216.102(a). While the MMPA does not mandate any particular methodology for negligible impact determinations, it does require NMFS to base its decisions on science, not speculation. Where NMFS has adopted criteria to determine negligible impact, based on PBRs that themselves incorporate

18

"the best scientific information available," the agency must apply those criteria, or some other equally valid scientific methodology.  16 U.S.C. § 1386(a).  It cannot lawfully "ignore available biological information."  Kern County Farm Bureau, 450 F.3d at 1080-81.

IV.    NMFS VIOLATED THE ESA

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved [and] to provide a program for the conservation of [listed] species."  16 U.S.C. § 1531(b). The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  Tennessee Valley Authority v. Hill, 437 U.S. 153, 180 (1978).  "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost."  Id. at 184.  The ESA embodies "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies."  Id. at 185.

The heart of the ESA's protections for imperiled species is Section 7(a)(2)'s requirement that federal agencies, in consultation with NMFS (for marine species), "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or

19

threatened species." 16 U.S.C. § 1536(a)(2); see also 50 C.F.R. § 402.01(b).[12] The obligation to "insure" against jeopardy requires agencies to "give the benefit of the doubt" to imperiled species, with the risk of uncertainty "borne by the project, not by the [listed] species." Sierra Club v. Marsh, 816 F.2d 1376, 1386 (9th Cir. 1987).

Here, in addition to the Navy, NMFS proposed to take actions – promulgating MMPA regulations and issuing LOAs for HSTT activities – threatening harm to listed species. Accordingly, both NMFS and the Navy are considered "action agencies" subject to ESA section 7(a)(2) and must consult NMFS's ESA Interagency Cooperation Division, the "consulting agency," to assess the risks their actions pose to those species and insure against jeopardy. See Greenpeace v. NMFS, 80 F. Supp. 2d 1137, 1140-41 (W.D. Wash. 2000).

When consultation concludes, NMFS must formulate a BiOp "detailing how the agency action affects [listed] species." 16 U.S.C. § 1536(b)(3)(A). The BiOp must include, inter alia, "[a] detailed discussion of the effects of the action on listed species" and:

---

[12] "Jeopardize the continued existence of" means engaging in an action that "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

> [NMFS's] opinion on whether the action is likely to jeopardize the continued existence of a listed species … (a "jeopardy biological opinion"); or, the action is not likely to jeopardize the continued existence of a listed species … (a "no jeopardy" biological opinion).

50 C.F.R. § 402.14(h).  In formulating its BiOp, NMFS must use the "best scientific and commercial data available."  Id. § 402.14(g)(8); see also 16 U.S.C. § 1536(a)(2).

ESA Section 9 generally prohibits any person, including federal agencies, from "taking" any listed animal.  16 U.S.C. §§ 1532(13), 1538(a)(1).  When NMFS concludes a federal agency's proposed action will not cause jeopardy, its BiOp may include a statement authorizing the taking of listed species incidental to the proposed action.  Id. § 1536(b)(4).  NMFS's incidental take statement ("ITS") must specify, among other things, "the impact, i.e., the amount or extent, of such incidental taking on the species."  50 C.F.R. § 402.14(i)(1)(i).  The ITS "functions as a safe harbor provision immunizing persons from Section 9 liability and penalties for takings committed during activities that are otherwise lawful and in compliance with its terms and conditions."  Arizona Cattle Growers' Ass'n v. U.S. Fish and Wildlife Service, 273 F.3d 1229, 1239 (9th Cir. 2001).

21

A.    NMFS Failed To Ensure Against Jeopardy.

In its BiOp, NMFS claims it conducted "exposure analyses … to identify the number, age (or life stage), and gender of the individuals that are likely to be exposed to" the effects of HSTT activities "and the populations or subpopulations … those individuals represent."  NMFS-65177.  NMFS further claims it integrated its analysis of risks HSTT activities pose to individual animals "to identify consequences to the populations those individuals represent."  NMFS-65178.

As NMFS explained:

When individual animals would be expected to experience reductions in their current or expected future reproductive success, we would also expect those reductions to also reduce the abundance, reproduction rates, or growth rates … of the populations those individuals represent … .

Id.  NMFS understood that, if  "listed animals are likely to experience reductions in their current or expected future reproductive success," it is vital to "integrate those individuals [sic] risks to determine if the number of individuals that experience reduced fitness (or the magnitude of any reductions) is likely to be sufficient to reduce the viability of the populations those individuals represent."  NMFS-65179.  To determine whether "changes in the viability of one or more population is or is not likely to be sufficient to reduce the viability of the species," NMFS claimed it considered, inter alia, "a suite of population viability models."  Id.  The record in

22

this case is, however, devoid of meaningful analysis of reduction to reproductive potential from HSTT activities, rendering NMFS's "no jeopardy" findings arbitrary and capricious.  <u>See</u> Baird Decl. ¶¶ 24-39.

       1.    <u>Whales.</u>

While the tens of thousands of incidents where Navy activities will prevent endangered whales from feeding, resting, nursing, communicating or breeding can cause population-level effects, <u>see</u> NMFS-37036, Plaintiffs focus on NMFS's authorization of lethal takes, as there is no disputing that "[d]ead animals are no longer capable of contributing to the survival and recovery of the population or the species."  NMFS-65468.  NMFS's BiOp acknowledges that "[t]he death of a female of any of the large whale species would result in a reduced reproductive capacity of the population or species."  NMFS-65468.  NMFS then authorized the Navy to kill up to three endangered large whales each year of the five-year permit.  NMFS-65464, 65466.[13]

_____

[13] NMFS says it does "not expect any western North Pacific gray whales to be involved in a ship strike event," but nonetheless authorizes mortalities from that species.  NMFS-65448.  For the other endangered whales, NMFS mentions only "one death in a given year not to exceed three deaths over the five year period" (<u>see</u> NMFS-65445, 65447, 65450-51, 65454), even though the ITS authorizes three mortalities annually, a total of fifteen deaths over five years.  NMFS-65341,

Less than three weeks before the initial BiOp came out, a reviewer sounded

the alarm that it "[n]eed[s] conclusions on vessel strike throughout."  NMFS-

52397.  NMFS subsequently provided conclusions, but failed to "support and

explain [its] conclusions with evidence and reasoned analysis."  <u>Center for</u>

<u>Biological Diversity</u>, 623 F.3d at 648.  Instead, faced with all these deaths, NMFS

stated the truism that "[r]emoval of one or more individuals of a particular species

from a population will have different consequenses [sic] on the population

depending on sex and maturity of the animal," and called it a day.  NMFS-65445.

Having identified information about the sex and maturity of whales likely to

be killed as key factors for its jeopardy analysis, NMFS was obliged, but failed, to

analyze them.  NMFS "entirely failed to consider an important aspect of the

problem," rendering its "no jeopardy" opinion unlawful.  <u>Motor Vehicle Mfrs.</u>

<u>Ass'n</u>, 463 U.S. at 43.

 Moreover, as noted in the BiOp, NMFS has at its disposal "a suite of

population viability models."  NMFS-65179.  The agency failed to use any

population viability model, or any other accepted scientific method, to assess the

effect on the affected species' prospects for survival of lost reproductive potential

_____

65464, 65466.  Having authorized these lethal takes, NMFS was obliged to ensure
they would not cause jeopardy.  16 U.S.C. § 1536(b)(4)(B).

due to HSTT activities, another fatal flaw.  Baird Decl. ¶¶ 25-34 & Exh. 4.  The

ESA's mandate to use "the best scientific and commercial data available," 16

U.S.C. § 1536(a)(2), means NMFS cannot lawfully "'ignore available biological

information or fail to develop projections' which may indicate potential conflicts

between the proposed action and the preservation of endangered species."

Greenpeace, 80 F. Supp. 2d at 1150 (quoting Conner v. Burford, 848 F.2d 1441,

1454 (9th Cir. 1988)).

           2.     <u>Turtles.</u>

NMFS fared no better assessing whether HSTT activities would jeopardize

listed sea turtles.  NMFS determined Navy explosives training would kill four

turtles from any of five listed "Pacific Sea Turtle" species – leatherback,

loggerhead, olive ridley, hawksbill and green – in Hawai'i waters and the Transit

Corridor.  NMFS-65381, 65465.  In addition, NMFS concluded thirteen Pacific

Sea Turtles annually would experience lung injury.  <u>Id.</u>  Because "sea turtles that

experience even a slight lung injury … would be expected to die as a result of that

injury," NMFS effectively concluded Navy training would kill seventeen Pacific

Sea Turtles annually.  NMFS-65468.  In addition, NMFS determined Navy vessel

strikes would kill an unspecified number of listed turtles throughout the HSTT

study area.  NMFS-65458.  NMFS then authorized every single lethal take,

including unlimited mortalities from vessel strikes.  NMFS-65465, 65467.

NMFS's May 2013 draft BiOp concludes with:  "Yada, yada, yada."

NMFS-50149.  NMFS's lead on the BiOp, Kristine Petersen, later explained she

"obviously [had] something to add there, but hadn't done it yet."  NMFS-64108.

She continued:

> I think that section was to highlight that we must address the effects of
> injury and mortality of turtles.  Looking at several earlier east coast
> range BiOps, I found that we failed to do that adequately (at least in
> the ITS we missed it).  I don't want to miss it again.

Id.

Unfortunately, NMFS's analysis never subsequently got beyond "yada,

yada, yada."  Initially, while the BiOp observes that "[v]essel strike of sea turtles

… has the potential to be highly-significant," NMFS never attempted to quantify

how many imperiled turtles Navy vessels were likely to kill.  NMFS-65299.  After

Plaintiffs filed suit, NMFS acknowledged this flaw and issued a "corrected" BiOp

to try to cure it.  NMFS-64648; NMFS-65124.  However, rather than estimate the

number of turtles likely to perish, NMFS merely added "Ship Strike … to ITS with

unspecified number of sea turtles taken annual[ly] and over the [five-year] period."

NMFS-65107 (emphasis added); see also NMFS-65125 ("corrected" BiOp

contains no new analyses, information or facts).

NMFS's protests it cannot estimate incidental mortality from vessel strikes are baseless.[14]  The BiOp notes "that turtles in close enough proximity to be at risk of permanent threshold shift [("PTS")] would also be vulnerable to ship strike." NMFS-65342.  Since NMFS calculated up to 123 listed turtles would suffer PTS from HSTT activities, the same number would be at risk of death from vessel strikes.  See NMFS-65465, NMFS-65467.  NMFS's failure "to analyze and develop projections based on information that was available" renders its jeopardy analysis arbitrary and capricious.  Greenpeace, 80 F. Supp. 2d at 1150.

As with endangered whales, NMFS failed to apply available population viability models to evaluate whether HSTT-related deaths would jeopardize any affected turtle species.  Baird Decl. ¶¶ 37-38.  NMFS knew "sea turtles are demographically vulnerable to increases in mortality, particularly of juveniles and subadults, those stages with higher reproductive value." NMFS-65469.  It further knew that, even without HSTT-related harm, "green, hawksbill, leatherback, and loggerhead turtles have high probabilities of becoming extinct in the Pacific Ocean." NMFS-65327.

---

[14] Alternatively, if NMFS cannot derive even a ballpark estimate of turtle mortalities, it has no basis to evaluate jeopardy.  Baird Decl. ¶ 36.

27

The Ninth Circuit instructs that, where "baseline conditions already jeopardize a species, an agency may not take action that deepens the jeopardy by causing additional harm."  National Wildlife Federation v. NMFS, 524 F.3d 917, 930 (9th Cir. 2008).  In other contexts, before authorizing far fewer mortalities, NMFS performed extensive analyses – evaluating the number, sex and maturity of turtles likely to die and applying multiple population viability models – to assess whether a proposed action would deepen jeopardy.  E.g., Exh. 5 (evaluating effects of authorizing seven loggerhead and six leatherback mortalities).[15]  NMFS performed none of these analyses before giving the Navy the green light to kill, each year, seventeen turtles from any of the critically imperiled turtle species due to explosives, plus an open-ended number (which the BiOp suggests could exceed 120 more deaths) from vessel strikes.  NMFS's failure to use available analytic tools violates the ESA's "best available science requirement."  Consolidated Salmonid Cases, 791 F. Supp. 2d 802, 834 (E.D. Cal. 2011).

NMFS's sole explanation for its "no jeopardy" conclusion is its "belief that the same level of take occurred in the past."  NMFS-65469.  Even if that assumption were justified (and the Navy's substantial increase in HSTT activities

_____

[15] Plaintiffs request judicial notice of this BiOp "for the existence of [its] content, not for the truth of disputed matters asserted" therein.  Consolidated Salmonid Cases, 688 F. Supp. 2d 1013, 1017 (E.D. Cal. 2010).

calls NMFS's assumption into serious question), NMFS has never before quantified sea turtle take from HSTT activities, much less conducted meaningful analysis whether the number of deaths and other harm NMFS authorized would "cause[] some deterioration in the species' preaction condition." National Wildlife Federation, 524 F.3d at 930; see, e.g., Navy-H90261-63 (BiOp for SoCal Range Complex, 2009-2014); Navy-H92439-40 (BiOp for Hawai'i Range Complex, 2008-2013). Having now quantified turtle take, NMFS was obliged "to consider the immediate[ and long-term effects of the action and 'articulate[ ] a rational connection between the facts found and the conclusions made'" regarding jeopardy. Wild Fish Conservancy v. Salazar, 628 F.3d 513, 525 (9th Cir. 2010) (citation omitted). NMFS illegally failed to conduct the "focused and meaningful analysis" the ESA mandates. Greenpeace, 80 F. Supp. 2d at 1148.

B.    NMFS Authorized ESA Take In Excess Of MMPA Take.

The ESA prohibits NMFS from authorizing take unless it is authorized under the MMPA. 16 U.S.C. § 1536(b)(4)(C). NMFS was well-aware of this prohibition when it issued its "corrected" BiOp. NMFS-65107-08; NMFS-65570. Nonetheless, the "corrected" BiOp allows Navy testing activities to kill five endangered whales over five years, two more than NMFS authorized under the MMPA, rendering the ITS unlawful. Compare NMFS-65466 with NMFS-65593.

29

C.   <u>NMFS's Take Statement For Turtles Is Invalid.</u>

In its initial BiOp, NMFS acknowledged Navy vessels might strike and kill listed turtles, but neither quantified such take nor authorized it.  NMFS-49534, 49650, 49657, 49659.  After Plaintiffs highlighted this flaw, NMFS attempted to cure it by adding "an unspecified number of" ship strike takes to the ITS and providing that "[t]ake will be exceeded if the proposed levels of training and testing are exceeded."  NMFS-65107; <u>see also</u> NMFS-65465, 65467.  As discussed above, NMFS's failure to quantify take from ship strikes precluded it from rendering a non-arbitrary jeopardy finding.  NMFS's issuance of a blank check in the ITS, allowing unlimited vessel strike takes, further violates the ESA.

The ITS plays a critical role in protecting listed species from extinction, establishing "a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision, and requiring the parties to reinitiate consultation."  <u>Arizona Cattle Growers' Ass'n</u>, 273 F.3d at 1249; <u>see also</u> 50 C.F.R. §§ 402.14(i)(4), 402.16(a).  To protect listed species, "Congress has clearly declared a preference for expressing take in numerical form."  <u>ONRC</u>, 476 F.3d at 1037 (citing H.R. Rep. No. 97-567, at 27 (1982), <u>reprinted in</u> 1982 U.S.C.C.A.N. 2807, 2827).  Use of "a surrogate instead of a numerical cap" is

30

permissible only if NMFS can "establish that no such numerical value could be practically obtained." Id. (citation and internal quotation marks omitted).

In the HSTT ITS, NMFS claims "it is very difficult" to estimate turtle take from vessel strikes, but provides no reasoned explanation for the alleged difficulty. NMFS-65465, 65467.  There is likewise no "evidence in the record that it was impractical to estimate … take." Center for Biological Diversity v. Bureau of Land Mgmt., 422 F. Supp. 2d 1115, 1138 (N.D. Cal. 2006).  On the contrary, NMFS's BiOp states "that turtles in close enough proximity to be at risk of [PTS] would also be vulnerable to ship strike." NMFS-65342.  Thus, NMFS could have limited take from vessel strike to 123, the number of turtles NMFS calculated would suffer PTS.  See NMFS-65465, 65467.  NMFS's "unexplained failure to comply with [the numeric limitation] requirement renders the [ITS] invalid." ONRC, 476 F.3d at 1038.

Even if NMFS could establish that no numeric limit were possible, its chosen surrogate – "[t]ake from vessel strike will be exceeded if activity levels as proposed are exceeded" – is unlawful.  NMFS-65463.  The Ninth Circuit has held that a surrogate "must be able to perform the functions of a numerical limitation," setting forth "a 'trigger' that, when reached, results in an unacceptable level of incidental take" and requires re-initiation of consultation.  ONRC, 476 F.3d at

31

1038 (citation omitted).  Because the HSTT ITS "both define[s] and limit[s] the

level of take using the parameters of the project," it cannot perform this vital

trigger function.  <u>Id.</u> at 1039.

As the Ninth Circuit explained in an analogous case:

the authorized level of take … cannot be reached until the project
itself is complete.  Even if the actual number of takings of [turtles]
that occurred during the project was considerably higher than
anticipated, the [ITS] would not permit [NMFS] to halt the project and
reinitiate consultation.  Instead, the permissible level of take is
coextensive with the project's own scope.

<u>Id.</u>

The ITS for vessel strikes involving listed turtles "could never trigger the

reinitiation of consultation because, by definition, the permissible take level is

coextensive with the scope of the project."  <u>Id.</u> at 1041.  It is, accordingly,

"arbitrary and capricious."  <u>Id.</u>

V.      THE HSTT EIS VIOLATES NEPA

NEPA is "our basic national charter for protection of the environment."  40

C.F.R. § 1500.1(a).  Congress passed NEPA "to protect the environment by

requiring that federal agencies carefully weigh environmental considerations and

consider potential alternatives to the proposed action before the government

launches any major federal action."  <u>Lands Council v. Powell</u>, 395 F.3d 1019, 1026

(9th Cir. 2005).  "[T]o accomplish this, NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences." Earth Island Inst. v. U.S. Forest Serv., 351 F.3d 1291, 1300 (9th Cir. 2003).

NEPA requires all federal agencies, including the Navy and NMFS, to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).[16]  An EIS must "provide full and fair discussion of significant environmental impacts and [must] inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.

The alternatives section "is the heart of the environmental impact statement."  Id. § 1502.14.  Agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives," devoting "substantial treatment to each alternative considered in detail ... so that reviewers may evaluate their comparative merits."  Id. § 1502.14 (a), (b).  The core purpose of the alternatives analysis is to "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public."  Id. § 1502.14.

---

[16] NMFS may adopt the Navy's EIS only if, after independent review, NMFS concludes it is legally adequate.  40 C.F.R. § 1506.3.

33

A.     Failure To Analyze A True "No Action" Alternative.

The Council on Environmental Quality's ("CEQ's") implementing

regulations for NEPA, which apply to all federal agencies, specify an EIS must

"[i]nclude the alternative of no action."  Id. § 1502.14(d); see also id. § 1500.3.

This alternative is mandated to "provide[] a benchmark, enabling decisionmakers

to compare the magnitude of environmental effects of the action alternatives."  46

Fed. Reg. 18,026, 18,027 (Mar. 23, 1981).  CEQ has emphasized that "[i]nclusion

of such an analysis in the EIS is necessary to inform the Congress, the public, and

the President as intended by NEPA."  Id.  The Ninth Circuit likewise concluded

that "[i]nformed and meaningful consideration of alternatives – including the no

action alternative – is … an integral part of the statutory scheme."  Bob Marshall

Alliance v. Hodel, 852 F.2d 1223, 1228 (9th Cir. 1988), cert. denied, 489 U.S. 1066

(1989) (emphasis added).

Despite NEPA's unambiguous command, the HSTT EIS fails to include a

true "no action" alternative.  The Navy asserts the "no action" alternative may be

"thought of in terms of continuing with the present course of action until that

action is changed."  Navy-H170161.  Accordingly, the Navy's "no action"

alternative evaluates the continuation of "currently conducted training and testing

34

activities (baseline activities) and force structure (personnel, weapons and assets) requirements as defined by existing Navy environmental planning documents." Id.

The flaw in the Navy's logic is that HSTT activities occur pursuant to MMPA authorizations that were expiring in early 2014. Navy-H170080. To conduct training and testing beyond early 2014, the Navy needed new MMPA authorizations. The Navy knew this; its EIS expressly states it is "needed to support the Navy's request to obtain an incidental take authorization from NMFS." Id. Furthermore, the HSTT EIS was intended to "serve as NMFS's NEPA documentation for the rule-making process under the MMPA." Navy-H170089.

In situations involving "federal decisions on proposals for projects," such as whether to issue new MMPA authorizations, CEQ has stated that "no action" means "the proposed activity would not take place." 46 Fed. Reg. at 18,027. To support NMFS's permitting decision, the EIS was obliged, but failed, to evaluate a true "no action" alternative involving denial of the requested MMPA authorization. See, e.g., Western Watersheds Project v. Rosenkrance, 2011 WL 39651, at *10 (D. Idaho Jan. 5, 2011) ("If BLM truly did take no action, then the old grazing permits would expire, no new permits would issue, and no range improvements would occur"); Ocean Mammal Institute v. Gates, 546 F. Supp. 2d 960, 977 (D. Haw. 2008) (rejecting "'no action' alternative that involves the continuation of

35

individual training exercises using MFA sonar"). Presumably, in the absence of new authorizations, the Navy would modify its activities to avoid violating the MMPA. The HSTT EIS was required to evaluate that alternative.

In adopting the Navy's EIS, NMFS understood its duty to analyze an alternative in which it "denies the Navy's request for an incidental take authorization," acknowledging "this constitutes the NEPA-required No-action Alternative." NMFS-38823. NMFS further recognized the Navy's EIS "does not enumerate [this] alternative." Id.[17] The EIS's failure to discuss a true "no action" alternative violates NEPA. Bob Marshall Alliance, 852 F.2d at 1230.

Even if Defendants could lawfully consider continuing current HSTT activities as the "no action" alternative, the EIS fails to take the requisite hard look at the impacts of the full suite of current activities. As the EIS concedes, its "no action" alternative includes only "those training and testing activities and events as set forth in previously completed Navy environmental planning documents." Navy-H170161. It excludes analysis of several "areas where Navy training and

_____

[17] NMFS suggests the EIS nonetheless "supports" analysis of this alternative, but never explains how. Id. Even if NMFS's experts could, somehow, parse the EIS to extract information related to a true "no action" alternative, the EIS would still be "unacceptable" because it is "indecipherable to the public." Klamath-Siskiyou Wilderness Center v. Bureau of Land Managment, 387 F.3d 989, 996 (9th Cir. 2004); see also 40 C.F.R. § 1502.8 (EISs "shall be written in plain language" so "the public can readily understand them").

testing would continue as in the past, but were not considered in previous environmental analyses." Id.  Areas excluded from the so-called "no action" alternative include the portion of the Study Area west of the 179th meridian, the transit corridor between Southern California and Hawaiʻi, Navy piers and shipyards located in Hawaiʻi and Southern California, and San Diego Bay.  Navy-H170162.  Activities that threaten environmental harm, including gunnery, bombing, and sonar training, occur in these excluded areas.  See Navy-H170114, H170116.

The EIS does claim to evaluate all "areas where Navy training and testing would continue as in the past" and to evaluate "[c]urrent training and testing activities not addressed in previous environmental documents," but does so in discussing Alternative 1, not the so-called "no action" alternative.  Navy-H170162.  Defendants cannot, however, rely on Alternative 1 to fulfill their duty to evaluate the "no action" alternative.  Alternative 1 lumps current activities together with "changes to training and testing requirements necessary to accommodate" force structure changes and "[d]evelopment and introduction of ships, aircraft, and weapon systems." Id.; see also Navy-H170161 (Alternative 1 includes "adjustments to types and levels of activities[] from the baseline as necessary to support current and planned Navy training and testing requirements").

37

The EIS nowhere presents a "no action" alternative that "depict[s] accurately the [Navy's] present course of action." Conservation Northwest v. Rey, 674 F. Supp. 2d 1232, 1247 (W.D. Wash. 2009) (citation and internal quotation marks omitted). "Analysis of the 'no-action alternative' is at the heart of the NEPA process; thus, failure to provide a valid one casts a shadow over the process as a whole." Conservation Northwest v. Sherman, 715 F.3d 1181, 1188 (9th Cir. 2013). Defendants' failure to provide a clear and complete picture of the effects, standing alone, of continuing current HSTT activities "violated NEPA." Conservation Northwest, 674 F. Supp. 2d at 1247.

B.   Failure To Analyze Alternatives With Less Environmental Harm.

NEPA requires Defendants to "[r]igorously explore and objectively evaluate all reasonable alternatives" for conducting HSTT activities. 40 C.F.R. § 1502.14(a). To satisfy that obligation, Defendants had "to study all alternatives that appear reasonable and appropriate for study ..., as well as significant alternatives suggested by other agencies or the public during the comment period." Dubois v. United States Dep't of Ag., 102 F.3d 1273, 1286 (1st Cir. 1996), cert. denied, 521 U.S. 1119 (1997); see also id. at 1291.

The Navy's EIS considers only the aforementioned "no action" alternative, "along with two virtually identical alternatives": (1) more training and testing

38

("Alternative 1") and (2) yet more training and testing ("Alternative 2").

Muckleshoot Indian Tribe v. U.S. Forest Service, 177 F.3d 800, 813 (9th Cir. 1999); see also Navy-H170161-211.  Numerous commenters – both agencies and members of the public – urged the Navy to consider alternatives that would reduce harm to marine mammals by prohibiting or restricting HSTT activities in specific areas identified as biologically important.  See, e.g., Navy-H121949; Navy-H151876-79; Navy-H151939, H152011-15, H152022-23; Exh. 2.  NMFS likewise recommended the EIS evaluate "areas in which Navy activities could be limited or modified in scope or nature in order to minimize impacts to protected resources," noting that "development of alternatives that identify additional geographic mitigations … will better support NMFS' use of the Navy's EIS to support [its] MMPA action."  Navy-H121722; see, e.g., Navy-H164280-85; Navy-H166493 (suggesting specific areas).

The Navy's analysis indicated the most severe harm – permanent injuries and mortalities – occurs when marine mammals are in close proximity to Navy sonar, explosives and vessels.  See Navy-H170694-95, H170738, H170799-807.  Considering alternatives that restrict HSTT activities in biologically important areas is, therefore, vital to NEPA's purpose:  "to require disclosure of relevant environmental considerations that were given a 'hard look' by the agency, and

39

thereby to permit informed public comment on proposed action and <u>any choices or alternatives that might be pursued with less environmental harm</u>."  <u>Lands Council</u>, 395 F.3d at 1027 (emphasis added).

NEPA requires that, in responding to public comments, the Navy "[d]evelop and evaluate alternatives not previously given serious consideration by the agency" or "[e]xplain why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position."  40 C.F.R. § 1503.4(a)(2), (5).  The Navy flatly refused to "carry forward for analysis any separate alternatives with pre-determined geographic or temporal restrictions." Navy-H170158; <u>see also</u> NMFS-39396 ("Fleet will never voluntarily propose what amounts to a geographic mitigation, this is I believe a Navy wide red-line"). Accordingly, to comply with NEPA, it was incumbent on the Navy to address each biologically important area the public proposed for protection and justify its refusal to consider alternatives limiting HSTT activities in that area.

The EIS states its analysis is provided in Chapter 5's "discussion of potential mitigation measures."  Navy-H170158.  There, the Navy erected a straw man consisting of a blanket ban on all training and testing in any marine mammal habitat, limiting HSTT activities to a severely constrained set of abyssal waters and surveyed offshore waters.  Navy-H171639-40, H171642-44.  The Navy then

40

declared that "avoiding all marine species habitats … for the purpose of mitigation would be impractical with regard to implementation of military readiness activities … ."  Navy-H171643 (emphasis added); see also Navy-H171639.

The Navy's conclusion that avoiding all marine species habitats and placing most ocean waters off-limits was not reasonable does not justify its refusal to evaluate in the EIS alternatives restricting activities in at least some biologically important areas.  As NMFS observed, the Navy took "a very black and white approach to what [it] is capable of doing to further protect marine mammals."  Navy-H166473.  Rather than "think about what they COULD do to effect reduced impacts in [biologically important] areas[,] … the Navy seems to have gone back and figured out when they CANNOT totally relocate or cease training/testing."  Navy-H166477.

Statements that HSTT "activities require continuous access to large areas" and "[s]ystems must be tested in a variety of bathymetric and environmental conditions" do not justify the Navy's refusal to evaluate specific biological areas proposed for protection.  Navy-H171640.  As NMFS biologist Jolie Harrison noted, "We did NOT suggest that Navy need avoid everything within the 200-[meter] isobaths!"  Navy-H166484.  No commenter suggested the Navy should not have "a variety of different types of undersea areas available for training."  NMFS-

41

2101.  Focusing on that red herring, the Navy ignored the real question:  whether "every single unique [area] needs to be available" at all times.  Id.  The Navy never justified its claim it requires unrestricted access to every inch of an ocean area the size of all fifty United States, violating its duty to explain its refusal to consider alternatives protecting at least some of the biologically significant areas identified in comments.  See 40 C.F.R. § 1503.4(a)(5); California v. Block, 690 F.2d 753, 767 (9th Cir. 1982) (agency must justify "fundamental premise" before rejecting alternatives).

The Navy's claim that geographic or temporal restrictions to protect sensitive habitats are infeasible cannot be squared with its inclusion in both action alternatives of a Humpback Whale Cautionary Area within the Hawaiian Islands Humpback Whale National Marine Sanctuary.  Navy-H171633-35.  To reduce impacts to humpback whales, the Navy agreed to a temporal restriction in these "important calving areas," banning training exercises during the critical winter months absent "case-by-case" authorization from the Pacific Fleet commander.  Navy-H171633.  The EIS never explains why the Navy can restrict activities in one part of the humpback sanctuary, but cannot even consider imposing similar restrictions in other parts of the sanctuary or in any other biologically important area.  Cf. NMFS-38634 ("mitigation measures do not have to be absolute").

42

The Navy's flat refusal to consider alternatives restricting training in various biologically important areas contravened NEPA's command "to put on the table, for the deciding agency's and for the public's view, a sufficiently detailed statement of environmental impacts and alternatives so as to permit informed decision making." Lands Council, 395 F.3d at 1027. The Navy could not lawfully "disregard alternatives merely because they do not offer a complete solution to the problem." Natural Resources Def. Council v. Hodel, 865 F.2d 288, 296 n.4 (D.C. Cir. 1988) (Bader Ginsberg, J.); see also City of Carmel-by-the-Sea v. Department of Trans., 123 F.3d 1142, 1159 (9th Cir. 1997). While restricting activities in sensitive areas may impose some burdens on the Navy, it was vital for the EIS to explore those alternatives to "take into proper account all possible approaches to a particular project … which would alter the environmental impact and the cost-benefit balance." Bob Marshall Alliance, 852 F.2d at 1228 (citations omitted).

NMFS knew that, to satisfy NEPA, it was obliged to evaluate an alternative "with additional mitigation requirements for marine mammals, potentially including measures considered but eliminated in Chapter 5" and others NMFS and the public had suggested. NMFS-38823. As one NMFS biologist observed, "it is important to understand the DEGREE and SCOPE of potential impacts on the effectiveness of a military readiness activity so that it can be balanced against the

43

degree to which a given measure is expected to reduce impacts to [marine mammals]." Navy-H166477. The Navy's refusal to disclose such information in the HSTT EIS violated its duty to examine "alternatives that might be pursued with less environmental harm," Lands Council, 395 F.3d at 1027, rendering its EIS "inadequate." Muckleshoot, 177 F.3d at 814.

NMFS knew the Navy's EIS "does not enumerate" such an alternative. NMFS-38823. NMFS adopted it anyway, violating its duty to ensure the EIS's adequacy. 40 C.F.R. § 1506.3(a).

VI.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit this Court should hold Defendants violated the MMPA, ESA, NEPA and APA.

DATED:     Honolulu, Hawaiʻi, October 30, 2014.

EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawaiʻi  96813


/s/ David L. Henkin
By:   DAVID L. HENKIN
Attorneys for Plaintiffs Conservation
Council for Hawaiʻi, Animal Welfare
Institute, the Center for Biological Diversity,
and Ocean Mammal Institute

44

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.5(e), I certify that the foregoing brief is set in a proportionally spaced 14-point font (Times New Roman) and contains 8,998 words, exclusive of the caption, tables, and signature block.  I have relied upon Microsoft Word to determine the word count.


DATED:      Honolulu, Hawaiʻi, October 30, 2014.

                                        EARTHJUSTICE
                                        850 Richards Street, Suite 400
                                        Honolulu, Hawaiʻi  96813


                                        /s/ David L. Henkin
                              By:     DAVID L. HENKIN
                                        Attorneys for Plaintiffs Conservation
                                        Council for Hawaiʻi, Animal Welfare
                                        Institute, the Center for Biological Diversity,
                                        and Ocean Mammal Institute