COLIN A. YOST #7739
1600 Kapiolani Boulevard, Suite 1700
Honolulu, HI 96814
Telephone: (808) 783-9430
Fax: (866) 338-2191
E-mail: colin@yostlawhawaii.com

JENNIFER A. SORENSON, *pro hac vice*
NANCY S. MARKS, *pro hac vice*
STEPHEN ZAK SMITH, *pro hac vice*
Natural Resources Defense Council
111 Sutter Street, 20th Floor
San Francisco, CA 94104
Telephone: (415) 875-6164
Fax: (415) 875-6161
E-mail: jsorenson@nrdc.org;
nmarks@nrdc.org; zsmith@nrdc.org

*Attorneys for Plaintiffs in Case No. CV 14-00153-SOM-RLP*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CONSERVATION COUNCIL FOR HAWAI'I *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE *et al.*,<br><br>        Defendants.<br><br>NATURAL RESOURCES DEFENSE | Lead Case No. CV 13-00684-SOM-RLP<br><br>*Consolidated with* Case No. CV 14-00153-SOM-RLP<br><br>**PLAINTIFFS NATURAL RESOURCES DEFENSE COUNCIL, INC., ET AL.'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT; CERTIFICATE OF COMPLIANCE** |

COUNCIL, INC., *et al.*,

      Plaintiffs,

v.

NATIONAL MARINE FISHERIES
SERVICE *et al.*,

      Defendants.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iii

INTRODUCTION ...........................................................................................1

BACKGROUND ...............................................................................................4

I.   Statutory and Regulatory Framework.....................................................4

    A.   Marine Mammal Protection Act.......................................................4

    B.   Endangered Species Act ..................................................................4

II.   Factual Background.................................................................................5

    A.   The Navy's Activities in Southern California and Hawaii ...........5

    B.   Harm to Marine Mammals from the Navy's Exercises ...............6

    C.   Administrative Proceedings ...........................................................8

ARGUMENT......................................................................................................9

I.   Standard of Review ................................................................................9

II.   NMFS Violated the Marine Mammal Protection Act...........................10

    A.   NMFS's Negligible Impact Determination Is Arbitrary
        and Capricious ................................................................................10

        1.   NMFS failed to analyze the population-level
            consequences of significant behavioral disruptions........11

        2.   NMFS failed to analyze the population-level
            consequences of mortalities.................................................20

        3.   NMFS's negligible impact determinations for beaked
            whales and blue whales contradict the record .................23

i

a.  The record shows that sonar exposure may already be harming beaked whale populations in California .................................................................23

b.  The record shows disruptions to blue whales' foraging behavior from sonar exposure ..................28

B.  NMFS Failed to Prescribe Adequate Mitigation..........................32

1.  NMFS failed to mitigate significant behavioral disruptions ..............................................................33

2.  NMFS failed to impose time-area restrictions in all but one area..................................................................35

III.  NMFS Violated the Endangered Species Act ........................................40

A.  NMFS's "No Jeopardy" Conclusion for Blue Whales Contradicts the Record ....................................................40

B.  NMFS Authorized More Mortalities than It Analyzed .............43

IV.  The Navy Violated the Endangered Species Act ...................................45

CONCLUSION ....................................................................................47

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Evans,*
    371 F.3d 475 (9th Cir. 2004)................................................................21, 38

*Humane Soc'y of U.S. v. Locke,*
    626 F.3d 1040 (9th Cir. 2010)..........................................................9, 37, 39

*Hunt v. Wash. State Apple Adver. Comm'n,*
    432 U.S. 333 (1977) ...................................................................................47

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ...................................................................................47

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ...................................................................10, 20, 28, 43

*NRDC v. Evans,*
    279 F. Supp. 2d 1129 (N.D. Cal. 2003) ...............................................32, 34

*Ocean Mammal Inst. v. Gates,*
    546 F. Supp. 2d 960 (D. Haw. 2008).........................................................35

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation,*
    426 F.3d 1082 (9th Cir. 2005).....................................................................9

*Wild Fish Conservancy v. Salazar,*
    628 F.3d 513 (9th Cir. 2010)................................................................45, 46

## STATUTES AND REGULATIONS

5 U.S.C. §§ 701-706 ......................................................................9

16 U.S.C. § 1362(1) .....................................................................21

16 U.S.C. § 1362(9) .....................................................................20

16 U.S.C. § 1362(13) .....................................................................4

16 U.S.C. § 1362(18)(A)(ii) ........................................................12

16 U.S.C. § 1362(18)(B)(ii) ..................................................11, 12

16 U.S.C. § 1362(20) ..............................................................20, 21

16 U.S.C. § 1371(a) ........................................................................4

16 U.S.C. § 1371(a)(5)(A)(i) .......................................................32

16 U.S.C. § 1371(a)(5)(A)(i)(I) ...................................................19

16 U.S.C. § 1371(a)(5)(A)(ii) ......................................................32

16 U.S.C. § 1371(a)(5)(D) .............................................................4

16 U.S.C. § 1536(a)(2) .......................................................4, 43, 45

16 U.S.C. § 1536(b)(4) ...................................................................5

16 U.S.C. § 1536(b)(4)(B) ............................................................43

16 U.S.C. § 1536(b)(4)(C) ............................................................45

16 U.S.C. § 1538(a)(1) ...................................................................5

50 C.F.R. § 216.102(a) ...................................................................4

iv

50 C.F.R. § 216.103 ...................................................................................11, 16

50 C.F.R. § 218.84(a)(3)(i) .................................................................39

50 C.F.R. § 402.14(a) ..........................................................................5

50 C.F.R. § 402.14(b) ..........................................................................5

50 C.F.R. § 402.14(g)(8) ......................................................................5

50 C.F.R. § 402.14(h)(3) ......................................................................5

50 C.F.R. § 402.14(i)(1) ......................................................................43

## OTHER AUTHORITIES

53 Fed. Reg. 8473 (Mar. 15, 1988) ...................................................21

54 Fed. Reg. 40,338 (Sept. 29, 1989)......................................16, 20, 21

61 Fed. Reg. 54,157 (Oct. 17, 1996) .................................................22

73 Fed. Reg. 35,510 (June 23, 2008) ................................................37

73 Fed. Reg. 60,754 (Oct. 14, 2008) ................................................39

74 Fed. Reg. 33,828 (July 13, 2009) .................................................17

78 Fed. Reg. 73,010 (Dec. 4, 2013)...................................................39

# INTRODUCTION

Hearing "plays a critical role" in the lives of whales and other marine mammals. NMFS 4089, 4091. In a dark ocean, these animals rely on their hearing to find food, avoid predators, and communicate with other members of their species. *Id.* Loud, human-generated noise in the ocean is known to disrupt marine mammals' behavior in significant ways; it can also injure or kill them. NMFS 1361-62, 4088-101.

In December 2013, the U.S. Navy began a five-year battery of training and testing exercises using high-powered sonar and explosives in the waters off southern California and Hawaii. The National Marine Fisheries Service (NMFS) authorized these exercises, just as it had others in the past, even though the Navy is increasing its activities substantially. By NMFS's own estimates, the Navy's increased exercises will have unprecedented impacts on marine mammals: up to 155 deaths, more than 2,000 permanent injuries, and nearly 9.6 million instances of temporary hearing loss and significant disruptions of vital behaviors. NMFS 37032 tbl.17, 37034 tbl.19. The Navy itself acknowledges that these numbers represent more than a tripling of impacts to marine mammals from sonar and other acoustic

1

sources, compared to impacts from the level of training and testing previously authorized in these areas. *See* Navy H00168057-61.

NMFS papered over these increased impacts, stating simply that while "an increased number of exposures may take place . . . , the types and severity of individual responses . . . are not expected to change." NMFS 37036. But as NMFS recognizes, repeated impacts can add up, harming populations. NMFS 4095. Despite the staggering number of behavioral disruptions it authorized, NMFS failed to analyze the population-level consequences of these disruptions. Nor did NMFS analyze the population-level consequences of the mortalities it authorized, although in many cases the authorized number of mortalities would threaten the sustainability of marine mammal populations, by NMFS's own calculations. NMFS also disregarded new studies showing impacts from sonar exposure on the feeding activity of beaked whales and blue whales. NMFS's determination that the Navy's activities will have a "negligible impact" on marine mammal populations contradicts the record and violates the Marine Mammal Protection Act.

NMFS also violated the Act by failing to require adequate mitigation. Despite the steep increase in harm, it prescribed virtually the same

2

mitigation it had in the past. It required no mitigation for the vast majority of harms: serious disruptions of vital behaviors. And although the most effective mitigation is to restrict activities in important marine mammal habitat, NMFS failed to impose such restrictions in all but one area.

Additionally, NMFS violated the Endangered Species Act by issuing a flawed analysis of the impacts of the Navy's exercises on endangered whales. Rather than incorporate the new science on blue whales, NMFS cut and pasted its analysis from previous authorizations, which predated the new science. NMFS further erred by authorizing more mortalities of endangered whales than it analyzed. Despite these patent shortcomings in NMFS's analysis, the Navy is relying on NMFS's authorization, which also violates the Endangered Species Act.[1]

---

[1] Plaintiffs Natural Resources Defense Council et al. (collectively, NRDC) do not seek to halt the Navy's exercises. Instead, NRDC seeks a tailored injunction restricting the use of mid-frequency sonar and underwater explosives in specific areas and at specific times of biological importance to marine mammals, until defendants comply with federal law. ECF No. 40 at 39-40. Briefing on remedy is reserved until after the Court rules on NRDC's motion for summary judgment. ECF No. 38 ¶ 6.

## BACKGROUND

### I.     Statutory and Regulatory Framework

#### A.     Marine Mammal Protection Act

Congress enacted the Marine Mammal Protection Act to ameliorate the effects of human activities on marine mammals. The heart of the Act is its moratorium on the "taking"—the harassment, hunting, capturing, or killing—of marine mammals. 16 U.S.C. §§ 1371(a), 1362(13). NMFS may grant limited exemptions to the moratorium only if, using the best available science, 50 C.F.R. § 216.102(a), it determines that the takes would have a "negligible impact" on marine mammal species or stocks, and it prescribes methods and means of effecting the "least practicable adverse impact" on them. 16 U.S.C. § 1371(a)(5)(D). If these requirements are met, NMFS may authorize takings of marine mammals for periods of up to five years.

#### B.     Endangered Species Act

Section 7 of the Endangered Species Act requires federal agencies to ensure that their actions are "not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2). An agency whose action is likely to have an adverse effect on endangered species

4

must consult with NMFS. 50 C.F.R. § 402.14(a), (b). NMFS, using the best

scientific data available, prepares a biological opinion evaluating the action

and stating whether it is likely to jeopardize any listed species. *Id.*

§ 402.14(g)(8), (h)(3). Because the Act prohibits the unauthorized "taking"

of endangered species, 16 U.S.C. § 1538(a)(1), if NMFS determines that an

agency's proposed action will not cause jeopardy but may result in

incidental takes, then NMFS must include with its biological opinion a

statement authorizing the incidental take. *Id.* § 1536(b)(4).

## II.     Factual Background

### A.      The Navy's Activities in Southern California and Hawaii

The Navy conducts training and testing exercises on "ranges" off

southern California and Hawaii. NMFS 4078-79. Although it has trained in

these waters for decades, the Navy is now increasing the tempo of its

exercises. Navy H00167491-503 (comparing the "no action" alternative,

which represents the level of training and testing previously authorized in

these areas, with "alternative 2," the selected alternative).[2] During

---

[2] "Alternative 2" also includes Navy activities in areas in which the Navy was already active, but which were not covered by previous authorizations. *Id.*

5

antisubmarine-warfare and other exercises, the Navy uses mid-frequency, high-intensity active sonar. Navy H00167451-56. Active sonar generates sound to detect objects in the marine environment. *Id.* Each year, for five years, the Navy plans to operate its most powerful, hull-mounted, mid-frequency active sonar systems for more than 11,000 hours, and plans to use other mid-frequency active sonar for more than 13,000 hours. NMFS 4076-77 tbls. 5 & 7; *see* NMFS 1416 (describing the MF1 category as one of the Navy's "most powerful" sonar sources). The Navy will also detonate more than 52,000 underwater explosives annually, in the course of torpedo tests, ship-sinking events, bombing exercises, and other activities. NMFS 4075-76 tbls. 4 & 6; Navy H00169042-203.

### B.   Harm to Marine Mammals from the Navy's Exercises

The Navy's ranges in southern California and Hawaii are home to at least thirty-nine species and more than sixty stocks of marine mammals. NMFS 4079-85. Southern California contains important foraging habitat for endangered blue whales and fin whales, NMFS 37017, and may host at least eight species of beaked whales, NMFS 1339-45, making it a potential biodiversity hotspot for these vulnerable, deep-diving species. The Hawaiian Islands have nurtured several endemic populations of whales

6

and dolphins, whose entire range is limited, in some cases, to single islands within the chain. *See, e.g.*, Navy H00159231, H00159244-45.

The record shows that the Navy's use of mid-frequency sonar and underwater explosives can injure and kill marine mammals. NMFS 4096-99. Military sonar activities have been linked to mass strandings of marine mammals around the world, including at least five events in which sonar used during exercises involving the Navy was a contributing factor. Navy H00167987. Beaked whales exposed to military sonar have been found to suffer internal hemorrhaging and other symptoms consistent with severe decompression sickness, or "the bends." NMFS 4097-101. The Navy's underwater detonations have also killed marine mammals; in 2011, at least three dolphins died in an explosion. NMFS 4096.

Additionally, exposure to mid-frequency sonar and explosives is known to disrupt marine mammals' behavior. NMFS 4091-95. Behavioral disruptions, especially if repeated, can have serious impacts on individual animals and, ultimately, on populations. NMFS 4095. For example, as NMFS explains, "long-term and intense disturbance stimuli can cause population declines by reducing the body condition of individuals that have been disturbed, followed by reduced reproductive success, reduced

7

survival, or both." *Id.* Studies show that exposure to mid-frequency sonar may have population-level consequences for beaked whales and endangered blue whales. *See infra* pp. 25-27, 29-30.

The Navy projects that its exercises in southern California and Hawaii will more than triple the impacts on marine mammals from sonar and other acoustic sources, compared to the level of activity previously authorized in these areas. *See* Navy H00168057, H00168060-61 (citing a 333 percent increase in impacts from the "no action" alternative to "alternative 2" for training activities, and a 468 percent increase for testing activities).

## C.   Administrative Proceedings

In 2012, the Navy requested authorization to take nearly 9.6 million marine mammals over five years. NMFS 1354 tbl.5-1, 1358 tbl.5-3. These takes include 155 mortalities, more than 2,000 permanent injuries, and millions of "Level B" harassment takes, which represent temporary hearing loss and significant disruptions of vital behaviors. *Id.*; NMFS 4112-13. NMFS issued a Proposed Rule in January 2013, a Final Rule and Letters of Authorization in December 2013, and superseding Letters of Authorization in May 2014. NMFS 414, 514, 4068-69, 36995-96, 65572, 65588. NMFS concluded that the nearly 9.6 million takes requested by the Navy would

8

have a "negligible impact" on marine mammal species and stocks, and it authorized all of these takes. NMFS 37032-34, 37037.

NMFS and the Navy consulted with NMFS's Endangered Species Act Interagency Cooperation Division about the effects of the Navy's exercises on endangered species, including six species of whales. NMFS 65123-25. NMFS issued a Biological Opinion in December 2013, and a "corrected" Biological Opinion in April 2014, concluding that the Navy's exercises would not jeopardize the continued existence of any species, including blue whales. NMFS 65124-25, 65450. NMFS issued an Incidental Take Statement authorizing three lethal takes per year, from vessel strikes, of each of the endangered whale species. NMFS 65462-70.

## ARGUMENT

### I.  Standard of Review

Courts review challenges under the Marine Mammal Protection Act, the Endangered Species Act, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706, under the "arbitrary and capricious" standard. *See Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1047 (9th Cir. 2010); *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1090 (9th Cir. 2005). The agency must "examine the relevant data and articulate

a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). An agency decision is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

## II.   NMFS Violated the Marine Mammal Protection Act

### A.   NMFS's Negligible Impact Determination Is Arbitrary and Capricious

NMFS's conclusion that nearly 9.6 million takes will have a "negligible impact" on marine mammal species and stocks, many of them endangered and depleted, defies credulity and contradicts the record. Despite the dramatic increase in the Navy's activities and the corresponding increase in harm, NMFS authorized the Navy's exercises just as it had in the past. In so doing, NMFS failed to analyze the population-level consequences of repeated behavioral disruptions; it

10

authorized mortalities for fifteen different stocks of whales and dolphins that, by NMFS's own calculations, would threaten the sustainability of these populations; and it disregarded new studies showing the impacts of sonar exposure on the feeding activity of beaked whales and blue whales.

### 1. NMFS failed to analyze the population-level consequences of significant behavioral disruptions

To make a negligible impact determination, NMFS was required to analyze whether the authorized takes would affect "annual rates of recruitment or survival." 50 C.F.R. § 216.103. Although NMFS acknowledges that there are "known avenues through which behavioral disturbance of individuals can result in population-level effects," NMFS 4124, 37036, it failed to analyze whether repeated, significant behavioral disruptions would lead to population-level consequences here.

Because Congress has prescribed a higher standard for the harassment of marine mammals caused by military readiness activities, the 1.9 million annual Level B harassment takes authorized by NMFS all represent "significant[]" disruptions to marine mammal behavior. *See* 16 U.S.C. § 1362(18)(B)(ii). In any other context, a human act results in Level B harassment if it has the "potential" to disturb a marine mammal by

disrupting natural behavioral patterns, such as "migration, breathing, nursing, breeding, feeding, or sheltering." 16 U.S.C. § 1362(18)(A)(ii). But in the military readiness context, an act qualifies as Level B harassment only if it actually "disturbs or is likely to disturb" a marine mammal by disrupting such behavioral patterns, and only if these patterns are disrupted "to a point where [they] are abandoned or significantly altered." *Id.* § 1362(18)(B)(ii).

Disruptions that qualify as Level B harassment in the military readiness context include temporary hearing loss, as well as a variety of significant behavioral responses, such as: prolonged separation of mothers and calves, with disruption of their acoustic mechanisms for finding each other again; prolonged cessation of vocal behavior; long-term avoidance of an area; and "outright panic, stampede, [or] stranding." NMFS 4094-95, 4112-13. NMFS explains that these responses all either have a "higher potential" or are "likely" "to affect foraging, reproduction, or survival." *Id.* In contrast, "[m]inor and/or brief behaviors," such as alerting and orienting responses, do not qualify as Level B harassment in the military readiness context. *Id.*; NMFS 4115. NMFS uses a mathematical formula to predict what fraction of animals exposed to Navy sound sources at

12

particular decibel levels will respond in ways that qualify as Level B harassment.[3] NMFS 4114-16.

NMFS failed to analyze the population-level consequences of the Level B harassment takes it authorized, despite the significance of these takes. Even one-time harassment may have severe consequences if it directly affects reproduction or survival. *See* NMFS 4126. Mother-calf pairs are especially vulnerable. Temporary hearing loss "sustained during [a] time when communication is critical for successful mother/calf interactions" may have "serious impacts." NMFS 4089; *see also* NMFS 4093 (explaining that long-term "disruptions of mother/calf pairs or mating displays have the potential to affect the growth and survival or reproductive effort/success of individuals"). A study cited by NMFS, Miller (2012), observed the separation of a killer whale calf from its group in response to mid-frequency sonar exposure. Pls.' Concise Statement of

---

[3] In other words, the Level B takes authorized by NMFS do not represent the full number of times that marine mammals will be exposed to sonar and other sound sources during the Navy's exercises. NMFS 4112-13, NMFS 4115-16. They do not even represent the number of times that marine mammals will change their behavior in response to these sources. Instead, they represent only the fraction of those responses that NMFS has determined are serious enough to meet the statutory standard.

Undisputed Material Facts (Statement) Ex. A at 381. But NMFS made no attempt to analyze what proportion of the Level B takes it authorized could directly affect reproduction or survival.

NMFS also failed to analyze the consequences of repeated behavioral disruptions, which have the greatest potential for population-level effects. NMFS cites a 2013 study by New et al., which addresses the ways in which repeated disruptions affect an animal's energy budget. NMFS 37036; Statement Ex. B at 6; *see* Decl. of David Bain ¶¶ 5-7 (Bain Decl.), Ex. C to Pls.' Mot. for Leave to Submit Extra-Record Evidence (Mot. for Leave). For example, if an animal stops feeding and flees from a sound source, it does not consume as much food, or energy, as it otherwise would, and it expends additional energy by fleeing. *See* Statement Ex. B at 2.

According to New et al. (2013), a female beaked whale whose feeding behavior is repeatedly disrupted may not be able to reproduce, because her energy reserves may be so low that she is forced to abort a fetus or abandon a nursing calf. Statement Ex. B at 4, 11. Or, she may reproduce fewer times in her life because she is required to nurse each calf for a

longer period of time, or spend more time recovering between pregnancies. Statement Ex. B at 4, 11; Bain Decl. ¶¶ 19-28.[4]

Nonetheless, although the record shows that marine mammals "may be exposed to [mid-frequency sonar] for more than one day or on successive days," NMFS 4126, NMFS failed to analyze the impact of these repeated exposures. In other environmental analyses, NMFS has made at least some effort to consider the effects of the takes it is authorizing on the energy budgets of individual animals. For example, in its 2011 biological opinion on the Navy's exercises in Hawaii, NMFS concluded that the authorized takes of humpback whales in response to sonar exposure "are almost certain to affect the energetics of the humpback whales involved, particularly cows that are nursing calves because . . . nursing requires a substantial amount of energy." Navy H00127611. But NMFS did not perform this kind of analysis here.

---

[4] NMFS identifies additional ways in which behavioral disruptions may lead to population-level consequences, without analyzing those consequences here. For example, physiological stress caused by hearing loss or behavioral disturbance may result in population-level impacts: for instance, "[w]hen mounting a stress response diverts energy from a fetus, an animal's reproductive success and its fitness will suffer." NMFS 4091.

15

NMFS also did not analyze the impacts of the authorized takes on each affected species and stock individually, as required by law. *See* 50 C.F.R. § 216.103; 54 Fed. Reg. 40,338, 40,340 (Sept. 29, 1989). NMFS *says* it is conducting a "species-specific analysis," NMFS 37037, but it groups some species and stocks together (e.g., "mysticetes"), and omits other species entirely (e.g., bottlenose dolphins). Impacts on individual stocks will vary, and some will suffer more behavioral disruptions than others: for example, NMFS authorized an average of forty-three annual Level B harassment takes for *each* Baird's beaked whale in southern California. Statement ¶ 2.

Instead of conducting a species-specific analysis of the population-level consequences of behavioral disturbance, NMFS offers four rationales to support its conclusion that the impact of the Level B takes it is authorizing will be "negligible," across all thirty-nine species and sixty-plus stocks of marine mammals affected by the Navy's exercises. All four rationales are contrary to the record, and none excuses NMFS's failure to perform the analysis.

First, NMFS says behavioral disruptions are "more of a concern" if they "last over 24 hrs" or are "repeated in subsequent days." NMFS 7035. But as discussed above, NMFS acknowledges that marine mammals may

16

be exposed to mid-frequency sonar for "more than one day or on successive days." NMFS 4126. Nonetheless, NMFS says that long-term effects are not expected because "vessels with hull-mounted active sonar are typically moving at speeds of 10-15 knots," and it is "unlikely that the same animal could remain in the immediate vicinity of the ship for the entire duration of the exercise." *Id.* This rationale is repeated nearly verbatim from NMFS's authorization of Navy exercises in the Pacific Northwest, where the Navy planned to use mid-frequency sonar for only 110 hours annually, in short 1.5-hour exercises, and did not plan any major exercises involving more than one surface vessel. *See* 74 Fed. Reg. 33,828, 33,830, 33,886 (July 13, 2009).

Here, in contrast, the Navy plans to operate its most powerful mid-frequency sonar for more than 11,000 hours per year, NMFS 4076 tbl.5, and will conduct a total of more than eighty major training events, some of which will last twenty-one days or longer and involve seven or more surface vessels. NMFS 1269 tbl.1-5, Navy H00169121-29. Some of these events will have "periods of concentrated, near-continuous anti-submarine warfare sonar use by several platforms during a several-week period." Navy H00167599. Although the Navy also points out that the ships are not

17

stationary, it nonetheless predicts that "[s]ome animals may be exposed to this activity multiple times over the course of a few days and leave the area." Navy H00168033. NMFS did not analyze which species and stocks these prolonged events will affect, and what the consequences of these repeated takes will be.[5]

Second, NMFS says its take estimates do not account for "the fact that most marine mammals will likely avoid strong sound sources." NMFS 4125. But NMFS acknowledges that avoidance itself may result in a take because an animal may miss an opportunity to feed, or its reproductive behavior may be disrupted. *Id.*; *see also* NMFS 4093. NMFS made no effort to quantify these likely avoidance takes or to analyze their population-level consequences.

Third, NMFS says that no behavioral disturbance has been observed during actual Navy exercises in southern California and Hawaii. NMFS 4125. But NMFS admits that most behavioral disruptions are unlikely to be observed. *Id.* Moreover, if NMFS is implying that some authorized takes

---

[5] Similarly, NMFS did not consider the long-term consequences of temporary hearing loss that lasts "a few days" or imposes "energetic costs." NMFS 4126.

18

will not actually occur, that is irrelevant. NMFS may not permit takes of marine mammals unless it determines that the "total taking" will have a negligible impact. 16 U.S.C. § 1371(a)(5)(A)(i)(I). For purposes of its analysis, NMFS must assume that *all* the authorized takes will occur.

Fourth, and finally, NMFS points to sound levels at which most Level B takes will occur, noting that, in general, "an animal's exposure to a higher received level is more likely to result in a behavioral response that is more likely to adversely affect the health of the animal."[6] NMFS 4125. But elsewhere, NMFS emphasizes the importance of the context in which an exposure occurs (including the age of the animal exposed, and whether the exposure occurs at a "critical reproductive time or location"), and says that the received level alone does not determine the severity of the impact. NMFS 4091; 37003; 37021; 37036. NMFS cannot dismiss the possibility of population-level consequences by divorcing sound levels from context.

Without an analysis of the population-level consequences of significant behavioral impacts, NMFS's negligible impact determination

---

[6] "Received level" refers to the loudness of a sound at the location of the animal exposed to it; "source level" refers to the loudness of the sound at its source. NMFS 4087.

lacks a "rational connection between the facts found and the choice made."

*See State Farm*, 463 U.S. at 43.

> ## 2. NMFS failed to analyze the population-level consequences of mortalities

NMFS also failed to analyze the population-level consequences of the mortalities it authorized. For fifteen stocks of marine mammals, NMFS authorized mortalities that exceed the "potential biological removal" level that NMFS has calculated for the stock. This level represents the maximum number of animals that may be removed from the stock while still allowing it "to reach or maintain its optimum sustainable population." 16 U.S.C. § 1362(20). Because human-caused mortalities that exceed potential biological removal have a greater than "negligible" impact on the stock by definition, NMFS's authorization of these takes was illegal.

When NMFS adopted its regulatory definition of "negligible impact," it explained that an impact to a "depleted" stock is negligible only if it does not significantly reduce the increase of that population or "prevent ultimate achievement of [optimum sustainable population, or] OSP." 54 Fed. Reg. at 40,341. A depleted stock is one that is "below its optimum sustainable population," as defined by 16 U.S.C. § 1362(9), or is listed as

endangered or threatened under the Endangered Species Act. *Id*. § 1362(1). Thus, according to NMFS's own regulatory definitions, the impact of human-caused mortalities exceeding potential biological removal for a depleted stock cannot be "negligible," because such mortalities would prevent the stock from "reach[ing] . . . its optimum sustainable population." *Id.* § 1362(20).

Similarly, for a stock that is not depleted, "a finding of negligible impact can only be made if the permitted activities are not likely to reduce that stock below its OSP" (though "not all takings that do *not* reduce the population below its OSP would be considered negligible"). 54 Fed. Reg. at 40,342 (emphasis added). For such a stock, human-caused mortalities that exceed potential biological removal are by definition those mortalities that will prevent the stock from "maintain[ing]" its optimum sustainable population. 16 U.S.C. § 1362(20). Thus, the impact of these mortalities is also not negligible. These conclusions fulfill the purpose of the Marine Mammal Protection Act to ensure that marine mammals "maintain an 'optimum sustainable population' and remain 'significant functioning elements in the ecosystem.'" *Anderson v. Evans*, 371 F.3d 475, 498 (9th Cir. 2004); *see* 53 Fed. Reg. 8473, 8474 (Mar. 15, 1988).

21

NMFS has properly refused in other instances to permit incidental takes of marine mammals that exceed potential biological removal. For example, in rejecting the Coast Guard's application to take right whales by ship strike, NMFS reasoned, "because NMFS has determined that the loss of even a single northern right whale is significant (i.e., greater than PBR [potential biological removal]), a negligible impact finding under section 101(a)(5)(A) cannot be made for ship strikes of northern right whales by the USCG." 61 Fed. Reg. 54,157, 54,158 (Oct. 17, 1996).

Here, NMFS authorized mortalities that exceed potential biological removal for *fifteen* different stocks. Statement ¶¶ 6-13. Four of these stocks are endangered and depleted. *Id.* ¶¶ 6-8. Additionally, NMFS authorized up to three annual mortalities of Western North Pacific gray whales, a stock that is "critically endangered and shows no apparent signs of recovery." Statement ¶ 14; Navy H00167903. NMFS has not calculated potential biological removal for this stock but estimates a population size of 155. Statement ¶ 14. Potential biological removal for an endangered population of this size, were NMFS to calculate it, would almost certainly be less than one. *Id.*

22

Although NMFS staff were aware that NMFS was authorizing mortalities that exceeded potential biological removal for several stocks, *see* NMFS 38137, 42984, 42987, NMFS failed even to mention this issue in the Proposed or Final Rule. Nor did NMFS conduct a species-specific analysis for any of these stocks, except for sperm whales. NMFS 37037-40. That "analysis" fails to address the impact of the authorized mortalities, an egregious omission given NMFS's acknowledgment in its Biological Opinion that "[t]he death of a female of any of the large whale species [including sperm whales] would result in a reduced reproductive capacity of the population or species." NMFS 65468. NMFS's authorization of lethal takes exceeding potential biological removal for fifteen stocks, contrary to NMFS's own definition of "negligible impact," and without analyzing the population-level consequences of these takes, was arbitrary and capricious.

> **3.  NMFS's negligible impact determinations for beaked whales and blue whales contradict the record**
>
> > **a.  The record shows that sonar exposure may already be harming beaked whale populations in California**

NMFS's failure to analyze the population-level consequences of behavioral disturbance is particularly harmful to beaked whales. For all three stocks of beaked whales in the Navy's southern California range,

NMFS authorized an annual number of Level B harassment takes that is more than *seventeen times* the total number of animals expected to be present in the range. Statement ¶¶ 2-4. The record shows that repeated exposure to mid-frequency sonar likely harms beaked whale reproduction. NMFS's conclusion that the authorized takes will have a "negligible impact" on beaked whales contradicts the evidence before the agency.

As NMFS acknowledges, beaked whales are highly sensitive to sonar. NMFS 4115, 37021. For this reason, NMFS applies a unique formula when estimating Level B harassment takes of beaked whales—all exposures exceeding 140 decibels are assumed to result in a take. NMFS 4115. But a recent, Navy-funded study, DeRuiter et al. (2013), shows that beaked whales' sensitivity to sonar may be even greater than previously believed. NMFS 58368. Two tagged beaked whales exposed to simulated mid-frequency sonar engaged in "strong" and "sustained" avoidance responses, one beginning at 98 decibels and the other at 127 decibels—both well below the 140-decibel cutoff. NMFS 58370. Although the simulated sonar lasted for only thirty minutes, both whales continued fleeing from the sound

source for more than ninety minutes, and did not begin another deep (foraging) dive for more than six hours.[7] NMFS 58368-70.

Three additional studies, taken together, show that sonar exposure may already be harming beaked whale populations in California. First, as discussed above, New et al. (2013) found that beaked whales cannot reproduce as often if their energy intake is repeatedly reduced. The researchers concluded that female beaked whales "are able to survive, but not reproduce," in low-quality habitat, and in mediocre habitat, they will still reproduce, but they "will extend the duration of lactation . . . to increase the probability of their own survival." Statement Ex. B at 11. Thus, "anthropogenic disturbances that cause a consistent, minor reduction in energy intake over an extended period of time could potentially impact reproduction just as strongly as disturbances that completely halt energy acquisition over a shorter period." *Id.*

---

[7] NMFS notes that one whale did not respond similarly to actual Navy sonar transmitted during the study, NMFS 37021, but the source was 118 kilometers away. NMFS 58369. More than 80 percent of exposures to hull-mounted, mid-frequency sonar resulting in the Level B takes authorized here will occur at distances of 8.9 to 53.9 kilometers. NMFS 4125 tbl.21.

Second, a 2013 Navy-funded Ph.D. dissertation compared the composition of two beaked whale populations in the Bahamas—one on a Navy range and frequently exposed to sonar, and one off the Navy range and rarely exposed to sonar. Statement Ex. C at 1. The study found reduced reproductive success on the Navy range: for each adult female, there were fewer juveniles and calves. *Id.* at 1, 57-58, 71-73.

Third, two NMFS biologists, Moore and Barlow, have found "strong evidence" that beaked whale populations off California are declining rapidly. Navy H00159529-30, H00159534, H00159536-37 (estimating rates of decline ranging from 2.9 to 8.4 percent per year). They identify Navy sonar and other human-made acoustic disturbance as one of only two "plausible explanations" for this trend. Navy H00159538.

Considered together, these new studies paint a disturbing picture: (1) Exposure to mid-frequency sonar disrupts beaked whales' feeding behavior. (2) Beaked whales whose feeding is disrupted repeatedly cannot reproduce as often. (3) In fact, a beaked whale population on a Navy range in the Bahamas has been observed to have lower reproductive rates than a nearby population. (4) And, finally, beaked whale populations off

26

California are plummeting, and NMFS scientists have pointed to sonar exposure as a plausible cause.

Yet, in the face of this evidence, NMFS declined to analyze the population-level consequences of repeated Level B harassment takes on beaked whales. Instead, NMFS assumed that the Navy's activities will have no population-level effects on beaked whale stocks, for two reasons. NMFS 37039. NMFS's assumptions cannot be squared with the record.

First, NMFS concedes that beaked whales exposed to Navy sonar in the Bahamas have been observed to leave the area of the exercise, *see* Navy H00123148, but NMFS discounts this response because the whales "return within a few days after the event ends." NMFS 37039. NMFS has acknowledged, however, that responses lasting more than twenty-four hours are more likely to be serious. NMFS 4126. Given that many Navy exercises last multiple days, Navy H00169121-29, these avoidance responses could last for several days, or even weeks. Moreover, the high numbers of Level B takes that NMFS has authorized for beaked whales in southern California indicate that many, if not most, of these animals will be taken repeatedly. Statement ¶¶ 2-4.

Second, NMFS asserts that the Navy's southern California range supports high densities of beaked whales. NMFS 37039. But high densities do not rule out population-level impacts. Moore and Barlow propose that Navy ranges located in high-quality beaked whale habitat may act as "population sinks." Navy H00159538. A "population sink" is an area to which animals are drawn, but where they cannot survive and reproduce well. Decl. of Hal Whitehead ¶¶ 5-12, Mot. for Leave Ex. A. Although NMFS's own scientists have proposed that Navy sonar may be responsible for dramatic declines of beaked whales in California, and have suggested that the Navy's range may be a population sink, NMFS "entirely failed to consider" this possibility. *See State Farm*, 463 U.S. at 43.

NMFS's negligible impact determination for beaked whales contradicts the record and is arbitrary and capricious.

### b.   The record shows disruptions to blue whales' foraging behavior from sonar exposure

NMFS's failure to analyze the consequences of behavioral disturbance is also detrimental to endangered blue whales. NMFS authorized repeated Level B harassment takes for blue whales in southern California. Statement ¶ 5. More than half of these takes fall into the

28

especially serious category of temporary hearing loss, *id.*, which NMFS assumes will be accompanied by physiological stress responses. NMFS 4091. NMFS's conclusion that these takes will have a negligible impact on blue whales is at odds with the record, which shows that mid-frequency sonar affects blue whales in ways that, when repeated, could harm population health.

Blue whales are filter feeders that rely on large, dense patches of prey (mainly krill) to meet their energy requirements. ECF No. 40 ¶ 60; ECF No. 42 ¶ 60. Southern California is an important feeding area for these whales from June to November. *Id.* Because blue whales produce low-frequency vocalizations, it was previously assumed that they did not hear mid-frequency sonar. NMFS 65426. Two recent, Navy-funded studies demonstrate, however, that not only do blue whales *hear* mid-frequency sonar, but it can disrupt their foraging behavior.

The first study, Melcón (2012), found that blue whales in southern California "decreased the proportion of time spent producing D calls [foraging calls] to half" when mid-frequency sonar was present. Navy H00140323, H00140326-27. Because even low levels of sonar elicited this response, the researchers hypothesized that a single mid-frequency sonar

source was capable of affecting blue whales' behavior "over a broad region." Navy H00140326-27.

The second study, Goldbogen (2013), found that tagged blue whales exposed to simulated mid-frequency sonar and other mid-frequency noise broke off deep-feeding dives and traveled away from the sound source. NMFS 58363-65; NMFS 65426-27; Decl. of John Calambokidis ¶¶ 7-8 (Calambokidis Decl.), Mot. for Leave Ex. D. The study authors calculated that a blue whale that stopped foraging for one hour could lose over one metric ton of krill. NMFS 58365. The authors warn that "[f]or active sonar operations occurring near blue whale feeding areas . . . repeated exposures could negatively impact individual feeding performance, body condition and ultimately fitness and potentially population health." *Id.*

In its Final Rule, NMFS misrepresents and disregards this evidence. First, in its responses to comments, NMFS misrepresents the Goldbogen study. Discussing blue whale feeding disruption, NMFS says, "[i]t is important to note that this behavior was observed in response to exposure to pseudo random noise and not a simulated sonar signal." NMFS 37025. In fact, disruption of deep-feeding behavior was observed in response to both pseudo-random noise *and* a simulated sonar signal. NMFS 58361, 58363-64

30

& fig.2 (illustrating responses during exposure to "MFA," or simulated sonar); Calambokidis Decl. ¶ 8.

Second, in the section titled "Species-Specific Analysis," NMFS does not even discuss the disruptions to blue whale feeding behavior caused by mid-frequency sonar exposure, let alone analyze the potential population-level consequences of these disruptions. Instead, in a general section on mysticetes (baleen whales), NMFS says only that "[m]ost Level B harassments to mysticetes from sonar would result from received levels between 144 and 162" decibels. NMFS 37037. NMFS does not explain the significance of these levels. The behavioral disruptions observed in both Melcón (2012) and Goldbogen (2013) occurred in response to received levels within or below this range. *See* Navy H00140325; NMFS 58362 fig.1(*c*); NMFS 65203 (explaining that in Goldbogen (2013), blue whales were exposed to a "received sound level up to 160" decibels); NMFS 65427.

NMFS's analysis is incomplete and "runs counter to the evidence" in the record. *See State Farm*, 463 U.S. at 43. Thus, NMFS's conclusion that the Navy's activities will have a negligible impact on blue whales was arbitrary and capricious.

31

## B.   NMFS Failed to Prescribe Adequate Mitigation

NMFS was required to limit or eliminate the harms caused by the

Navy's activities by setting forth "permissible methods of taking" and

"other means of effecting the *least practicable adverse impact* on such species

or stock and its habitat, paying particular attention to rookeries, mating

grounds, and areas of similar significance." 16 U.S.C. § 1371(a)(5)(A)(i)

(emphasis added).[8] With this requirement, "Congress imposed a stringent

standard" to guarantee that the projected take would have "only a

negligible impact on affected species." *NRDC v. Evans*, 279 F. Supp. 2d

1129, 1159 (N.D. Cal. 2003). While NMFS "has some discretion to choose

among possible mitigation measures, it cannot exercise that discretion to

vitiate this stringent standard." *Id.* But that is precisely what NMFS did

here. It neglected to tackle the largest swath of harm: serious disruptions of

vital behaviors. And although the most effective mitigation measure is to

---

[8] For military readiness activities, "a determination of 'least practicable adverse impact on such species or stock' under clause (i)(II)(aa) shall include consideration of personnel safety, practicality of implementation, and impact on the effectiveness of the military readiness activity." *Id.* § 1371(a)(5)(A)(ii).

restrict activities in important marine mammal habitat, NMFS arbitrarily

failed to impose such restrictions in all but one area.

### 1. NMFS failed to mitigate significant behavioral disruptions

The mitigation measures NMFS prescribed—virtually the same

measures it included in past authorizations—rest almost entirely on an

observation-and-response regime. Depending on the type of activity

involved, a certain number of human lookouts are required to observe the

surface of the water. When a lookout sees a marine mammal within a

prescribed distance, or "mitigation zone," then the Navy must take specific

measures to reduce impacts. *See* NMFS 37044-45. These measures may

include powering down or turning off sound sources. *Id.*

As NMFS makes clear, these measures are designed to reduce marine

mammal mortality and permanent physical injury. *See* NMFS 37013, 37024.

They are not intended or expected to mitigate the millions of authorized

behavioral disruptions. Nor could they: as NMFS points out, the vast

majority of significant behavioral responses to hull-mounted sonar will

occur between 8.9 and 53.9 kilometers from the sound source, *see* NMFS

33

4125 tbl.21, distances well beyond the 914-meter mitigation zone for hull-mounted sonar. NMFS 37004 tbl.11.[9]

NMFS's failure to mitigate behavioral disruptions to the "least practicable adverse impact" vitiates the stringent mitigation standard prescribed by Congress, *see Evans*, 279 F. Supp. 2d at 1159, and it compounds NMFS's failure to analyze the population-level consequences of behavioral disruptions. While NMFS prioritizes mitigation measures that lessen the likelihood of adverse impacts on marine mammal populations, including those caused by harassment, NMFS 37006-07, it makes almost no attempt to mitigate the harm to populations that could result from millions of significant behavioral responses (which NMFS has not analyzed). NMFS's failure to mitigate cannot be reconciled with the mandate of the Marine Mammal Protection Act or the agency's stated approach to mitigation. *See id.*

---

[9] Mitigation zones will also fail to protect animals that suffer temporary hearing loss from hull-mounted sonar (another type of Level B take). The predicted average range for the onset of temporary hearing loss from hull-mounted sonar lies outside of the mitigation zone for that activity, at 3.5 kilometers. *See id.*

### 2.    NMFS failed to impose time-area restrictions in all but one area

In 2010, NMFS's parent agency, the National Oceanic and Atmospheric Administration (NOAA), affirmed that "[p]rotecting important marine mammal habitat is generally recognized to be the most effective [sonar] mitigation measure currently available." Navy H00163196; *see also Ocean Mammal Inst. v. Gates*, 546 F. Supp. 2d 960, 992 (D. Haw. 2008), *modified in part*, No. CV 07-00254, 2008 WL 2020406 (D. Haw. May 9, 2008) ("The weight of scientific evidence points to avoidance of marine mammal habitat as the most effective means of minimizing sonar-related injury to marine mammals."). Nonetheless, NMFS did not prescribe any time-area limitations on the Navy's activities within its eight million-square-kilometer southern California and Hawaii ranges, other than adopting a small cautionary area for humpback whales in Hawaii. NMFS 37045-46. NMFS's failure to do so was arbitrary.

Time-area mitigation consists of limiting activities in areas—and during times—particularly important to marine mammal populations, as reflected by high concentrations of animals or the critical life activities that occur in those areas (e.g., calving, mating, migration, etc.). Restricting Navy

activities in important areas and at critical times reduces the likelihood of exposing populations to adverse impacts from takes, does not depend on a human observer's ability to detect marine mammals, and can reduce impacts that occur farther from the source, like significant behavioral responses.

NMFS's justifications for not prescribing additional time-area measures do not withstand scrutiny. Its primary rationale—that time-area restrictions in a biologically important area would not benefit marine mammals if the Navy's use of the area is low—collapses for three reasons.[10]

First, the fullest articulation of this rationale in the Final Rule is facially false. Discussing whether it should set aside a portion of the leeward side of the island of Hawaii, which NMFS itself has identified as a biologically important area for several whale and dolphin populations, NMFS 4107, NMFS concludes that "time/area restrictions in this area

---

[10] NMFS relies on a variation of this theme in all responses to comments proposing specific time-area mitigation. *See* NMFS 37012 ("historical level of activity in the area . . . is very low"); NMFS 37013 ("there is limited use of any hull-mounted sonar . . . overlapping with humpback whale high-density areas"); NMFS 37017 ("Major Training Events (MTEs) are not typically planned in this vicinity.").

would not further reduce the likelihood or magnitude of adverse impacts on marine mammal species or stocks" because the Navy's use of the area is "very low." NMFS 37012. This cannot be true: barring the use of sonar in the area would reduce the likelihood of adverse impacts from *some* likelihood to *zero* likelihood.

Second, this rationale is inconsistent with NMFS's actions elsewhere. For example, NMFS kept in place the previous authorization's wintertime buffer around an important area for humpback whales in Hawaii, *see* NMFS 4106, even though the Navy's use of the area is low. NMFS 37013; *see* 73 Fed. Reg. 35,510, 35,539 (June 23, 2008) (describing use of the area as "rare and infrequent"). NMFS fails to explain why similar restrictions would not benefit more vulnerable populations, for example, the small resident populations of marine mammals whose range is limited to the west side of the island of Hawaii. *See* NMFS 4107, 5450-51, 37038; Decl. of Robin Baird ¶¶ 5-12, Mot. for Leave Ex. B. NMFS's failure to prescribe time-area restrictions to protect these populations, when it did so for a humpback whale population that appears to be recovering, *see* NMFS 37038, is arbitrary. *See Humane Soc'y*, 626 F.3d at 1053 (holding that NMFS's

failure to explain its "determination in light of seemingly inconsistent factual determinations" was arbitrary).

Third, and finally, NMFS may not rely on the Navy's assertions that it does not "typically" use an area or that historical use is low, while at the same time issuing regulations that authorize unlimited activities in the area. *See Evans*, 279 F. Supp. 2d at 1163. If unrestricted, the Navy is free to change its use patterns at any time.

NMFS's remaining rationale for rejecting time-area mitigation—that protecting well-defined blue whale and fin whale feeding habitat in southern California would be impractical for the Navy—also suffers from inconsistent treatment. NMFS deferred to the Navy's "indicat[ion] that establishment of a time-area closure within this region is not practical" because the habitat is "adjacent" to an underwater instrumented training range and "nearby" infrastructure supporting warfare mission areas. NMFS 37017. A similar fact pattern did not deter NMFS from imposing time-area restrictions on the Navy's training in the Atlantic. There, a portion of the southeast North Atlantic right whale mitigation area overlaps the coastal waters off the Mayport Naval Station in Florida, and other right whale mitigation areas are similarly "adjacent to" and "nearby"

38

important Navy infrastructure. *See* 78 Fed. Reg. 73,010, 73,056, 73,069 (Dec. 4, 2013); 73 Fed. Reg. 60,754, 60,763-64 (Oct. 14, 2008). NMFS's decision on these grounds not to impose similar protections for blue whales and fin whales was arbitrary. *See Humane Soc'y*, 626 F.3d at 1053.

Time-area restrictions need not be absolute. For example, in the humpback whale cautionary area, only the use of mid-frequency sonar is restricted between December 15 and April 15, and the restriction can be lifted if the Commander of the Pacific Fleet deems it necessary. *See* NMFS 37046. In the right whale mitigation areas in the Atlantic, certain activities are barred, but others may proceed. *See, e.g.*, 50 C.F.R. § 218.84(a)(3)(i) (prohibiting all hull-mounted mid-frequency sonar between November 15 and April 15, except for navigation training and object detection exercises, but allowing helicopter dipping using active sonar). NMFS could have identified particular activities that are harmful to marine mammals in certain places and at certain times, and imposed restrictions on those activities only. But, notwithstanding NOAA's affirmation that time-area restrictions are the most effective mitigation for sonar exposure, NMFS failed, apart from the humpback whale cautionary area, to impose restrictions even of this limited scope. Its failure to do so was arbitrary.

39

III.    **NMFS Violated the Endangered Species Act**

A.    **NMFS's "No Jeopardy" Conclusion for Blue Whales Contradicts the Record**

As discussed above, two recent studies found disruptions to blue whales' foraging behavior caused by exposure to mid-frequency sonar. *See supra* pp. 29-30. Although NMFS referred to these studies in its Biological Opinion, it failed to incorporate them in its analysis. Instead, NMFS cobbled together a conclusion by cutting and pasting from previous biological opinions that either predated and are contradicted by the new studies, or do not address the effects of mid-frequency sonar at all. As a result, NMFS's "no jeopardy" conclusion for blue whales is arbitrary.

NMFS purports to analyze the two studies, Melcón (2012) and Goldbogen (2013), in a section on blue whales' likely responses to acoustic sources. NMFS 65426-27. Discussing Goldbogen (2013), NMFS explains that "deep feeding whales and whales that were not feeding were particularly affected" by exposure to simulated sonar, and responses among affected whales "ranged from termination of deep foraging dives to prolonged mid-water dives." NMFS 65426. NMFS notes that whales responded even at low received levels. NMFS 65426-27. Discussing Melcón

40

(2012), NMFS states that blue whales made 36 percent fewer foraging calls in the presence of mid-frequency sonar at received levels of 85 to 115 decibels. NMFS 65427.

After discussing these studies, NMFS then repeats nearly word for word its conclusion about blue whales' likely responses to mid-frequency sonar from an earlier biological opinion, published in 2010. NMFS says that blue whales that occur "between 0.56 and 10 kilometers of a sonar ping, might . . . change their behavioral state if they are migrating, but they are not likely to change their behavioral state if they are actively foraging." *Compare* NMFS 65427 *with* Statement Ex. D at 261-62. This conclusion directly contradicts the two recent studies, which showed that blue whales stopped making foraging calls and broke off deep-feeding dives when exposed to actual or simulated mid-frequency sonar. The conclusion is baffling until one realizes it is taken from the 2010 biological opinion, which, before the new studies, assumed that blue whales were "less likely to devote attentional resources" to mid-frequency sounds. Statement Ex. D at 261. This outdated assumption and the conclusion it produced cannot be squared with the current record. Because NMFS failed to account for impacts on blue whales' foraging behavior, its further conclusion that "it is

41

unlikely that behavioral responses would have reproductive or fitness consequences" carries no weight. NMFS 65427.

Later, in the risk analysis section for blue whales (titled "Integration and Synthesis of Effects"), NMFS failed to consider the effects of mid-frequency sonar exposure at all. NMFS 65444-46. Instead, without providing any context or explanation, NMFS included a paragraph from a 2012 biological opinion analyzing the effects of the Navy's low-frequency "SURTASS" sonar system. *Compare* NMFS 65445 ("Given the size of mitigation zone . . . .") *with* Statement Ex. E at 146 ("Given the size of the LFA mitigation zone . . . ."). This paragraph describes the mitigation regime that the Navy uses with its low-frequency SURTASS system, which is entirely inapplicable to mid-frequency sonar. *See* NMFS 65312-14. Although the Navy's use of the SURTASS system is part of the environmental baseline affecting blue whales in Hawaii, *see* NMFS 65317, it is not part of the action that NMFS is analyzing here, *see* NMFS 37010, and NMFS's discussion of the SURTASS system cannot substitute for an analysis of the effects of mid-frequency sonar on blue whales.

42

Because NMFS failed to draw a "rational connection between the facts found and the choice made," *see State Farm*, 463 U.S. at 43, its "no jeopardy" determination for blue whales is invalid.

### B.  NMFS Authorized More Mortalities than It Analyzed

NMFS issued an Incidental Take Statement that authorized three serious injuries or mortalities per year from vessel strikes for each of six endangered species of large whales. NMFS 65464, 65466. The Incidental Take Statement is unlawful because NMFS failed to analyze the effects of these numbers of takes.

NMFS must ensure that incidental takes are "not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2); *see id.* § 1536(b)(4)(B) (authorizing incidental take only if it "will not violate" section 1536(a)(2)); 50 C.F.R. § 402.14(i)(1) (same). Here, for four species—blue whales, humpback whales, sei whales, and sperm whales—NMFS purported to analyze the effects of fewer serious injuries and mortalities from vessel strikes than it authorized. For each species, NMFS stated in its effects analysis that "up to one death in a given year not to exceed three deaths over the five year period could occur as a result of vessel strike." NMFS 65445; *see also* NMFS 65449; 65451; 65454. But in the

43

Incidental Take Statement, NMFS authorized *three* serious injuries or mortalities *per year* for each species, or fifteen such takes over five years. NMFS 65464, 65466.

For Western North Pacific gray whales, NMFS said in its effects analysis that it did "not expect *any* western North Pacific gray whales to be involved in a ship strike event," NMFS 65448 (emphasis added), but then NMFS authorized just as many serious injuries and mortalities for these whales as it had for the other species. NMFS 65464, 65466.[11]

Because NMFS failed to analyze the full effects of the take it authorized, it could not conclude that this level of take was not "likely to

---

[11] For a sixth species, fin whales, NMFS's effects analysis did not specify how many serious injuries or mortalities NMFS expected from vessel strikes. It said simply: "In the event of a vessel strike to a fin whale resulting in severe injury or mortality, individuals would likely experience significant fitness consequences . . . or would be totally removed from a population." NMFS 65447. Given the faulty analysis for the other species, it cannot be assumed that NMFS properly analyzed the effects of the three takes per year, or fifteen takes total, from vessel strikes that it authorized for fin whales. NMFS 65464, 65466.

jeopardize the continued existence of any endangered species." 16 U.S.C.

§ 1536(a)(2). The Incidental Take Statement is therefore unlawful.[12]

## IV.    The Navy Violated the Endangered Species Act

Section 7 imposes on the Navy a substantive duty to ensure that its

activities are not likely to jeopardize the continued existence of endangered

species. "Arbitrarily and capriciously relying on a faulty Biological Opinion

violates this duty." *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 532 (9th

Cir. 2010). Where a biological opinion's flaws are "legal in nature," so that

"discerning them requires no technical or scientific expertise," an agency's

reliance on the opinion may be arbitrary and capricious. *Id.* (internal

quotation marks and alteration omitted).

The Navy's reliance on the Biological Opinion is arbitrary and

capricious for two reasons. First, NMFS's discussion of the Melcón (2012)

---

[12] The Incidental Take Statement is unlawful for a second reason. An Incidental Take Statement may not authorize takes of endangered marine mammals that NMFS has not authorized under the Marine Mammal Protection Act. *Id.* § 1536(b)(4)(C). In the Final Rule, NMFS authorized a total of thirteen mortalities from vessel strikes for each of the endangered whale species, but in the Incidental Take Statement, it authorized a total of fifteen for each species. *Compare* NMFS 37032 tbl.17 n.5, 37034 tbl.19 n.3, *with* NMFS 65464, 65466.

and Goldbogen (2013) studies and its subsequent conclusions about the effects of the Navy's exercises on blue whales, *see supra* pp. 40-42, are so contradictory that the legal flaws in the Biological Opinion should have been apparent to any reader. *See Wild Fish Conservancy*, 628 F.3d at 532. Moreover, both studies were funded by the Navy, indicating that the Navy knew or should have known that the results of these studies undercut NMFS's conclusions. *See* NMFS 58365; Navy H00140323.

Second, NMFS also "committed legal error" when it issued an Incidental Take Statement that authorized more takes from vessel strikes than NMFS had analyzed in its Biological Opinion. *See Wild Fish Conservancy*, 628 F.3d at 532. Again, discerning this legal flaw "requires no technical or scientific expertise." *Id.* Thus, the Navy's reliance on the Biological Opinion and Incidental Take Statement is "arbitrary and capricious" and a violation of the Endangered Species Act. *Id.*

46

## CONCLUSION

For the foregoing reasons, the Court should grant NRDC's motion for summary judgment.[13]

Dated: October 30, 2014                     Respectfully submitted,

COLIN A. YOST #7739
1600 Kapiolani Boulevard, Suite 1700
Honolulu, HI 96814
Telephone: (808) 783-9430
Fax: (866) 338-2191
E-mail: colin@yostlawhawaii.com


/s/ Jennifer A. Sorenson
JENNIFER A. SORENSON, *pro hac vice*
Natural Resources Defense Council
111 Sutter Street, 20th Floor
San Francisco, CA 94104
Telephone: (415) 875-6164
Fax: (415) 875-6161
E-mail: jsorenson@nrdc.org

---

[13] NRDC has standing to bring this action. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); Statement ¶ 16 and declarations attached thereto.

47

NANCY S. MARKS, *pro hac vice*
Natural Resources Defense Council
40 West 20th Street
New York, NY 10011
Telephone: (212) 727-4414
Fax: (212) 727-1773
E-mail: nmarks@nrdc.org

STEPHEN ZAK SMITH, *pro hac vice*
Natural Resources Defense Council
1314 Second Street
Santa Monica, CA 90401
Telephone: (310) 434-2300
Fax: (310) 434-2399
E-mail: zsmith@nrdc.org

*Attorneys for Plaintiffs Natural Resources Defense Council, Inc.; Cetacean Society International; Animal Legal Defense Fund; Pacific Environment and Resources Center; and Michael Stocker*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.5(e), I certify that this brief complies with the word limitation of Local Rule 7.5(b) because it contains 9,000 words, excluding the parts of the brief exempted by Local Rule 7.5(d). This brief complies with the typeface and type style requirements of Local Rule 10.2(a) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 and 14-point Book Antiqua font. I have relied on Microsoft Word to determine the word count.

Dated: October 30, 2014

/s/ Jennifer A. Sorenson
JENNIFER A. SORENSON, *pro hac vice*
Natural Resources Defense Council

*Attorney for Plaintiffs Natural Resources Defense Council, Inc.; Cetacean Society International; Animal Legal Defense Fund; Pacific Environment and Resources Center; and Michael Stocker*