IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| CONSERVATION COUNCIL FOR HAWAII, et al., | ) ) ) | CIVIL NO. 13-00684 SOM/RLP |
| Plaintiffs, | ) ) ) | AMENDED ORDER GRANTING CONSERVATION COUNCIL'S MOTION FOR SUMMARY JUDGMENT, |
| vs. | ) ) | GRANTING NRDC'S MOTION FOR SUMMARY JUDGMENT, DENYING |
| NATIONAL MARINE FISHERIES SERVICE, et al. | ) ) ) | NRDC'S MOTION FOR LEAVE TO SUBMIT EXTRA-RECORD EVIDENCE, AND GRANTING IN PART AND |
| Defendants. _____ | ) ) ) | DENYING IN PART DEFENDANTS' MOTION TO STRIKE |
| NATURAL RESOURCES DEFENSE COUNCIL, INC, et al., | ) ) ) | CIVIL NO. 14-00153 SOM/RLP |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| NATIONAL MARINE FISHERIES SERVICE, et al., | ) ) ) | |
| Defendants. _____ | ) ) ) | |

**AMENDED ORDER GRANTING CONSERVATION COUNCIL'S MOTION FOR SUMMARY JUDGMENT, GRANTING NRDC'S MOTION FOR SUMMARY JUDGMENT, DENYING NRDC'S MOTION FOR LEAVE TO SUBMIT EXTRA-RECORD EVIDENCE, AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO STRIKE**

I.        INTRODUCTION.

        This case involves challenges by environmental groups to federal government actions affecting vast areas of the Pacific Ocean and the marine life in those areas.  Before the court is a motion for summary judgment filed in Civil No. 13-00684 by Plaintiffs Conservation Council for Hawaii, Animal Welfare Institute, Center for Biological Diversity, and Ocean Mammal

Institute (collectively, "Conservation Council"), and a separate motion for summary judgment filed in Civil No. 14-00153 by Plaintiffs Natural Resources Defense Council, Inc., Cetacean Society International, Animal Legal Defense Fund, Pacific Environment and Resources Center, and Michael Stocker (collectively, "NRDC"). The cases were consolidated by stipulation, but the stipulation provided that separate summary judgment motions could be filed by the parties in each case. <u>See</u> ECF Nos. 22, 23, 24 (ECF Nos. cited in this order refer to the docket sheet in Civil No. 13-00684). The court grants both summary judgment motions.

The government actions that are challenged in this case permit the Navy to conduct training and testing exercises even if they end up harming a stunning number of marine mammals, some of which are endangered or threatened. Searching the administrative record's reams of pages for some explanation as to why the Navy's activities were authorized by the National Marine Fisheries Service ("NMFS"), this court feels like the sailor in Samuel Taylor Coleridge's "The Rime of the Ancient Mariner" who, trapped for days on a ship becalmed in the middle of the ocean, laments, "Water, water, every where, Nor any drop to drink."

II.        **FACTUAL BACKGROUND.**

The issues in this case are best understood by examining specific details, but the court begins by providing a

broad overview.  This introductory section thus has the limited purpose of providing the context for the challenges raised by Conservation Council and NRDC to the actions taken by NMFS and the Navy.  Illustrations will be provided in connection with the court's analysis of specific challenges.

The Navy proposed to conduct training and testing activities in an area of the Pacific Ocean known as the Hawaii-Southern California Training and Testing ("HSTT") Study Area. This area includes (1) the Southern California Range Complex, consisting of San Diego Bay and approximately 120,000 square nautical miles of ocean between Dana Point, California, and San Diego, California; (2) the Hawaii Range Complex, consisting of approximately 2.7 million square nautical miles of ocean around the Hawaiian Islands; (3) Silver Strand Training Complex, on and adjacent to the Silver Strand, an isthmus between San Diego Bay and the Pacific Ocean; (4) pierside locations in Hawaii and Southern California; and (5) a transit corridor between Southern California and Hawaii.  See ECF No. 70, PageID # 13556; ECF No. 79, PageID # 14041.  Thirty-nine marine mammal species have been identified as occupying the HSTT Study Area, eight of which are endangered and one of which is threatened under the Endangered Species Act ("ESA").  See ECF No. 66-19, PageID # 10214.

In 2010, the Navy began the process of reviewing the environmental impact of its proposed activities and invited NMFS

to act as a cooperating agency in the preparation of the environmental impact statement ("EIS"). The Navy ultimately issued its corrected Final Environmental Impact Statement ("FEIS") on August 30, 2013, and NMFS adopted that FEIS on December 5, 2013. ECF No. 66-18, PageID # 10201; ECF 66-21, PageID # 10267. While working on the FEIS, the Navy was also consulting with NMFS on compliance with the Endangered Species Act and was applying for Letters of Authorization from NMFS under the Marine Mammal Protection Act ("MMPA") that would allow the Navy to take, incidental to the Navy's training and testing activities, a certain number of marine mammals in the HSTT Study Area.

Under the MMPA, "to take" means "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. § 1362(13). The Navy's proposed activities included "[s]onar use, underwater detonations, airguns, pile driving and removal, and ship strike," which the NMFS viewed as "the stressors most likely to result in impacts on marine mammals that could rise to the level of harassment, thus necessitating MMPA authorization." ECF No. 66-19, PageID # 10209.

The Navy sought authorization for the incidental take of the HSTT Study Area's thirty-nine species of marine mammals by Level B harassment. Id. at PageID # 10208. As applied to

military readiness activities, Level B harassment is "any act that disturbs or is likely to disturb a marine mammal or marine mammal stock in the wild by causing disruption of natural behavioral patterns, including, but not limited to, migration, surfacing, nursing, breeding, feeding, or sheltering, to a point where such behavioral patterns are abandoned or significantly altered."  16 U.S.C. § 1362(18)(B)(ii).  In addition, the Navy sought authorization for the incidental take of twenty-four of the thirty-nine species of marine mammals by Level A harassment or mortality.  ECF No. 66-19, PageID # 10208.  Level A harassment is "any act that injures or has the significant potential to injure a marine mammal or marine mammal stock in the wild."  16 U.S.C. § 1362(18)(B)(i).

In December 2013, pursuant to the MMPA, NMFS issued its Final Rule applicable to the period from December 2013 through December 2018, and issued Letters of Authorization permitting the Navy to take marine mammals in the HSTT Study Area during that period.  In summary, NMFS determined that the effect of the activities proposed by the Navy would have a "negligible impact" on all the marine mammal species and stocks that would be affected.  See ECF No. 66-19, PageID # 10249.  NMFS set authorized take levels for Level A and Level B harassment for each such species or stock.  The authorized take levels were the

levels requested in the Navy's application and included authorized mortalities.  See id. at PageID #s 10244-48.

Also in December 2013, the NMFS-ESA Cooperation Division issued a final Biological Opinion concerning the Navy's activities.  The Biological Opinion included NMFS's finding of "no jeopardy" to endangered whale species, authorization for an "unspecified number" of takes of turtles by vessel strikes, and a finding of "no jeopardy" to turtles.

Amended versions of the December 2013 LOAs and Biological Opinion subsequently issued.  See ECF No. 67-22, PageID #s 12766-69; ECF No. 67-23, PageID #s 12784-87; ECF No. 67-19.

Conservation Council has sued NMFS, which falls under the jurisdiction of the Department of Commerce, and other related parties, seeking judicial review under the Administrative Procedure Act ("APA") of administrative decisions that Conservation Council asserts violate the National Environmental Policy Act ("NEPA"), the MMPA, and the ESA.  See ECF No. 78. NRDC has sued NMFS and related federal officials as well as the Navy, similarly seeking judicial review under the APA for alleged violations of the MMPA and the ESA.  See ECF No. 73.  Plaintiffs in both cases seek summary judgment on all their claims.

For their part, Defendants contend that, having complied with the requirements of NEPA, the MMPA, and the ESA,

they are entitled to summary judgment in their favor in both actions.  <u>See</u> ECF No. 68; ECF No. 71.

III.     **STATUTORY FRAMEWORK.**

This case requires analysis of four statutory schemes.

A.     **MMPA.**

The MMPA was enacted to address concern that "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities."  16 U.S.C. § 1361(1).  Congress noted that "such species and population stocks should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, and, consistent with this major objective, they should not be permitted to diminish below their optimum sustainable population."  16 U.S.C. § 1361(2).

The MMPA imposes a general prohibition on the "taking" of marine mammals unless the taking falls under a statutory exception.  <u>See</u> 16 U.S.C. § 1371(a).

One statutory exception to the prohibition on the taking of marine mammals permits "citizens of the United States who engage in a specified activity (other than commercial fishing) within a specified geographical region" to take "small numbers of marine mammals of a species or population stock" during "periods of not more than five consecutive years each" if

7

the Secretary[1] finds that "the total of such taking during each five-year (or less) period concerned will have a negligible impact on such species or stock and will not have an unmitigable adverse impact on the availability of such species or stock for taking for subsistence uses."  16 U.S.C. § 1371(a)(5)(A)(i).

Congress amended the MMPA to exempt military readiness activities from the "specified geographical region" and "small numbers" requirements in 16 U.S.C. § 1371(a)(5)(A)(i).  See 16 U.S.C. § 1371(a)(5)(F).  Therefore, take of marine mammals incidental to military readiness activities, such as the Navy's activities at issue in this case, may be permitted if the taking will have a "negligible impact" on an affected species or stock and will not have "an unmitigable adverse impact on the availability of such species or stock for taking for subsistence uses."  16 U.S.C. § 1371(a)(5)(A)(i).

If those two findings are made, the Secretary must prescribe regulations setting forth "permissible methods of

---

[1] "Secretary" is defined as "the Secretary of the department in which the National Oceanic and Atmospheric Administration is operating, as to all responsibility, authority, funding, and duties under this chapter with respect to members of the order Cetacea and members, other than walruses, of the order Pinnipedia" and "the Secretary of the Interior as to all responsibility, authority, funding, and duties under this chapter with respect to all other marine mammals covered by this chapter."  16 U.S.C. § 1362(12)(A).  NOAA falls within the Department of Commerce, meaning that protection of marine mammals is split between the Department of Commerce and the Department of the Interior.

taking" and "other means of effecting the least practicable adverse impact on such species or stock and its habitat." 16 U.S.C. § 1371(a)(5)(A)(i)(II)(aa). In determining the "least practicable adverse impact" with respect to a military readiness activity, the Secretary is required to consider "personnel safety, practicality of implementation, and impact on the effectiveness of the military readiness activity." 16 U.S.C. § 1371(a)(5)(A)(ii).

**B.    ESA.**

The ESA requires federal agencies, in consultation with the Secretary of Commerce, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). "Jeopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

The Secretary of Commerce has delegated responsibility for administering the ESA with respect to threatened and endangered marine species to NMFS. See 50 C.F.R. § 17.2; see

also <u>Trout Unlimited v. Lohn</u>, 645 F. Supp. 2d 929, 932 (D. Or. 2007).

After completing consultation regarding a proposed action, NMFS must prepare a Biological Opinion that discusses whether the proposed action is likely to cause jeopardy and the effects of the proposed action on listed species or on the species' critical habitat.  50 C.F.R. § 402.14(h).  In preparing its Biological Opinion, NMFS must use "the best scientific and commercial data available."  50 C.F.R. § 402.14(g)(8).

If NMFS concludes that a proposed action will result in the incidental taking of an endangered or threatened species but will not cause jeopardy, it must include in its Biological Opinion an "incidental take statement" specifying, among other things, "the impact of such incidental taking on the species" affected.  <u>See</u> 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).  If an endangered or threatened species of marine mammal is involved, the take must be authorized under the MMPA.  <u>See</u> 16 U.S.C. § 1536(b)(4)(C).  Under the ESA, a taking that complies with an incidental take statement "shall not be considered to be a prohibited taking of the species concerned." <u>See</u> 16 U.S.C. § 1536(o)(2).

**C.   NEPA.**

NEPA is the "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  Congress enacted NEPA to ensure that all federal agencies would factor environmental considerations into decisionmaking.

To achieve this goal, NEPA requires a federal agency to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C). The EIS "shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.

An EIS shall "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14(a). "[S]ubstantial treatment" must be devoted "to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits."  40 C.F.R. § 1502.14(b).  A "no action" alternative also must be considered. 40 C.F.R. § 1502.14(c).

In reviewing an EIS, courts must ensure that the agency has taken a "hard look" at the environmental consequences of the

proposed action.  See Earth Island Inst. v. U.S. Forest Serv.,
351 F.3d 1291, 1300 (9th Cir. 2003); Smallwood v. U.S. Army Corps
of Eng'rs, Civ. No. 08-00512 DAE-KSC, 2009 WL 196228, at *10 (D.
Haw. Jan. 26, 2009).

>       **D.   Administrative Procedure Act.**

The APA is the vehicle through which challenges to
agency action as violative of the MMPA, ESA, and NEPA are brought
to court.  Oregon Natural Res. Council v. Allen, 476 F.3d 1031,
1036 (9th Cir. 2007) (review of ESA challenge under the APA);
Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846, 858
(9th Cir. 2005) (review of MMPA and NEPA challenges under the
APA).

Under the APA, a court must set aside agency action
that is "arbitrary" or "capricious."  5 U.S.C. § 706; see also
Butte Envtl. Council v. U.S. Army Corps of Eng'rs, 620 F.3d 936,
945 (9th Cir. 2010).  Review under the arbitrary and capricious
standard is "highly deferential, presuming the agency action to
be valid and affirming the agency action if a reasonable basis
exists for its decision."  Sacora v. Thomas, 628 F.3d 1059, 1068
(9th Cir. 2010) (internal quotation marks omitted).  "A
reasonable basis exists where the agency considered the relevant
factors and articulated a rational connection between the facts
found and the choices made."  Arrington v. Daniels, 516 F.3d

1106, 1112 (9th Cir. 2008) (internal quotation marks omitted).

An agency's decision will be set aside only if

> it has relied on factors which Congress had
> not intended it to consider, entirely failed
> to consider an important aspect of the
> problem, offered an explanation for its
> decision that runs counter to the evidence
> before the agency, or is so implausible that
> it could not be ascribed to a difference in
> view or the product of agency expertise.

Butte, 620 F.3d at 945 (internal quotation marks omitted).  A

court may not "infer an agency's reasoning from mere silence."

Crickon v. Thomas, 579 F.3d 978, 982 (9th Cir. 2009) (internal

quotation marks omitted).  "[E]ven when an agency explains its

decision with less than ideal clarity, a reviewing court will not

upset the decision on that account if the agency's path may

reasonably be discerned."  Id.

**IV.      LEGAL STANDARD.**

The parties ask this court to resolve their dispute

through summary judgment motions.  Summary judgment shall be

granted when "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as

a matter of law."  Fed. R. Civ. P. 56(a) (2010); see Addisu v.

Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  However,

in the context of reviewing an administrative decision under the

APA, "there are no disputed facts that the district court must

resolve."  Occidental Eng'g Co. v. I.N.S., 753 F.2d 766, 769 (9th

Cir. 1985).  "[T]he function of the district court is to

determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Id.; see also City & Cnty. of San Francisco v. United States, 130 F.3d 873, 877 (9th Cir. 1997). "[S]ummary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." Occidental, 753 F.2d at 770.

## V.    EXTRA-RECORD MATERIAL.

### A.    NRDC's Motion for Leave to Submit Extra-Record Evidence is Denied.

Judicial review of agency action is generally limited to the administrative record. Lands Council v. Powell, 395 F.3d 1019, 1029 (9th Cir. 2005). There are narrow exceptions to this general rule. Extra-record evidence may be allowed when "(1) supplementation is necessary to determine if the agency has considered all factors and explained its decision; (2) the agency relied on documents not in the record; (3) supplementation is needed to explain technical terms or complex subjects; or (4) plaintiffs have shown bad faith on the part of the agency." San Luis & Delta-Mendota Water Auth. v. Jewell, 747 F.3d 581, 603 (9th Cir. 2014) (quoting Fence Creek Cattle Co. v. U.S. Forest Serv., 602 F.3d 1125, 1131 (9th Cir. 2010)). NRDC relies on the third exception, arguing that extra-record evidence is necessary to clarify complex scientific concepts for the court. See ECF No. 76, PageID # 13857.

The court does not agree with NRDC that it needs the extra-record evidence NRDC wishes to submit. The exceptions to the general rule against extra-record evidence "operate to identify and plug holes in the administrative record." Powell, 395 F.3d 1019, 1030 (9th Cir. 2005). NRDC fails to identify any holes in the administrative record that need to be plugged. Many of the terms and concepts NRDC identifies as warranting explanation are adequately explained in the record or need not be reviewed in such depth that additional evidence is needed.

### B. Defendants' Motion to Strike is Granted in Part and Denied in Part.

Defendants move to strike the Declaration of Robin W. Baird, Ph.D., and Exhibits 1, 3, 4, and 5 to the declaration, arguing that no exception to the general rule barring extra-record evidence applies. See ECF No. 53, PageID # 1993.

Conservation Council argues that the Baird declaration is necessary to explain complex scientific matters and to show whether NMFS considered all factors and explained its decision. See ECF No. 83, PageID #s 14268-74. Exhibit 1 is Baird's curriculum vitae. Conservation Council also argues that Exhibits 3, 4, and 5 may be taken into account to show whether NMFS considered all factors and explained its decision. See id. at PageID #s 14257-67.

The court strikes the Baird declaration and Exhibit 1. Conservation Council fails to show that the Baird declaration is

necessary to explain technical terms or complex subjects.
Conservation Council does not point to any specific concepts or
terms absent from, or inadequately addressed in, the
administrative record. While Conservation Council contends that
the Baird declaration "provides necessary technical expertise"
regarding the scientific tools available to NMFS, ECF No. 83,
PageID # 14270, Conservation Council does not show that such
"technical expertise" is needed to decide the motions before this
court. Conservation Council may be offering the Baird
declaration to explain the material contained in Exhibits 3, 4,
and 5, but it is not clear that those documents require further
explanation.

Nor is the Baird declaration necessary to a
determination as to whether NMFS considered all factors and
explained its decision. Exhibits 3, 4, and 5 respond to that
need on their own, and no scientific interpreter is necessary.

The court will supplement the administrative record
with Exhibits 3, 4, and 5. Those documents are offered to show
the existence of particular factors, approaches, or analyses that
NMFS did not utilize. This is a purpose falling squarely within
the first exception to the general rule barring extra-record
evidence. See Jewell, 747 F.3d at 603 (extra-record evidence is
permitted if: "(1) supplementation is necessary to determine if
the agency has considered all factors and explained its decision"

(quoting <u>Fence Creek Cattle Co. v. U.S. Forest Serv.</u>, 602 F.3d 1125, 1131 (9th Cir. 2010))).  As Conservation Council notes, it must be able to show the existence and availability of a particular approach to support its argument that the approach was relevant and was not considered by NMFS.  See <u>Asarco, Inc. v. U.S. Envtl. Prot. Agency</u>, 616 F.2d 1153, 1160 (9th Cir. 1980) ("It will often be impossible . . . for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not.  The court cannot adequately discharge its duty to engage in a 'substantial inquiry' if it is required to take the agency's word that it considered all relevant matters.").

Exhibits 3, 4, and 5 were all prepared by NMFS, are all publicly available and easily accessible, and present no facts new to the parties, unlike the declarations submitted by NRDC, which provide new explanations or interpretations of matters in the administrative record.

The Baird declaration (ECF No. 79-1) and any references to it are stricken.  Exhibit 1, Dr. Baird's curriculum vitae (ECF No. 79-2), is stricken as irrelevant.  The court has not considered any of the stricken material in arriving at its summary judgment rulings.

**VI.    CONSERVATION COUNCIL AND NRDC ARE ENTITLED TO SUMMARY JUDGMENT.**

### A.    NMFS's "Negligible Impact" Finding Under the MMPA is Arbitrary and Capricious.

To permit the taking of marine mammals incident to military readiness activities, NMFS is required to find that the taking will have a "negligible impact" on affected species or stock.  16 U.S.C. § 1371(a)(5)(A)(i).  Under the MMPA, a taking has a "negligible impact" if it "cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival."  50 C.F.R. § 216.103.

While NMFS has found that the Navy's proposed activities will have a "negligible impact" on affected species or stock in the HSTT Study Area, that finding is so insufficiently supported as to be arbitrary and capricious.

### 1.    NMFS Must Examine the Impact of the Authorized Take, Not the Anticipated Take.

Before analyzing the bases NMFS provides for its "negligible impact" finding, this court resolves an unexpected dispute.  The parties have spilled much ink over the subject of what kind of take needs to have only a negligible impact. Conservation Council and NRDC are adamant that the take that NMFS has *authorized* must have a negligible impact.  See ECF No. 89, PageID # 14357; ECF No. 90, PageID # 14368.  Defendants, however,

18

say that what is relevant in this case is the take that is *anticipated*.  In Defendants' view, NMFS is "required to find that the incidental take expected from the activity, not the take requested, would have a negligible impact on affected species."  ECF No. 88, PageID # 14338.

In this case, the take requested was the take authorized, and the take authorized exceeds what NMFS and the Navy say is the take that is anticipated.  In short, this threshold determination is not merely technical; there are substantial differences between the anticipated take numbers and the authorized take numbers.  For example, the Navy is authorized to kill nineteen small odontocetes (e.g., dolphins) and pinnipeds (e.g., seals, sea lions) per year by testing activities using impulsive sound sources, even though the Navy says it expects no such mortalities to occur.  See ECF No. 66-6, PageID # 9558.  The Navy is also authorized to kill six large whales per year by vessel strike, even though the Navy says that the likelihood of such mortalities is virtually nil.  See id. at PageID # 9636.

This dispute takes the court by surprise for two reasons.  First, the MMPA makes it clear that it is *authorized* take that must be evaluated in determining whether there will be only a negligible impact.  Specifically, the MMPA says that the Secretary "shall allow . . . the incidental . . . taking . . . . of . . . marine mammals of a species or population stock if the

Secretary . . . finds that the *total of such taking* . . . will have a negligible impact on such species or stock." 16 U.S.C. § 1371(a)(5)(A)(i) (emphasis added). Because "the total of such taking" is the incidental taking that the Secretary "shall allow," this court concludes that the statute looks to the authorized take.

Second, if an agency bases its finding on the anticipated take but can then authorize a far greater take than is anticipated, the authorized take could end up having no basis at all. Suppose, for example, that the Navy anticipated that a particular exercise would kill one sperm whale in a certain stock of that endangered species, and NMFS found that to be a negligible impact. Under Defendants' reasoning, NMFS could then authorize the killing of any number of sperm whales, just because only one killing was anticipated. It makes no sense for NMFS to be able to *authorize* ten, fifty, or a hundred killings once it finds that the *anticipated* killing of one whale will have a "negligible impact." The impact of taking the additional nine, forty-nine, or ninety-nine whales would not have been considered at all before being authorized.

In fact, allowing any agency to apply this kind of reasoning to authorize the taking of marine mammals could not only mean authorizing the wiping out of endangered and threatened species, it could also mean authorizing the extinction of even

marine mammals that are not endangered or threatened. After all, under Defendants' reasoning, if the taking of a hundred mammals was anticipated and an agency found that for that particular plentiful mammal the loss of a hundred would have a negligible impact, Defendants' reasoning would allow the agency to authorize the taking of a million such mammals.

While the court doubts that Defendants would argue that the MMPA allows the exaggerated example the court posits, and the court is certainly not suggesting that Defendants have any interest in giving or receiving authorization for such a take, that example is precisely where Defendants' argument leads.

This court's focus throughout this case will be on the take *authorized* by NMFS. As a practical matter, it is the exceeding of the authorized take level that triggers a review of the Navy's activities by NMFS. See 54 Fed. Reg. at 40,347 (Sept. 29, 1989) ("[W]hen an incidental take authorization is exceeded, the activity must be reevaluated."). While a review may also occur if the *anticipated* take is exceeded, even defense counsel conceded at the hearing on these motions that a review is not necessarily required solely because the anticipated take level is exceeded. Indeed, as defense counsel noted at the hearing, the very reason that the Navy sought authorization of takes in excess of anticipated levels in the first place was that the Navy wanted to avoid having its exercises interrupted. If it had Letters of

Authorization providing authorized take levels, the Navy would not need to stop its activities even if the activities were clearly affecting marine mammals, so long as the Navy did not exceed the authorized take levels.  The Navy thus considered the authorized take to be a check on its behavior, while nothing in the record suggests that the anticipated take operated with equivalent effect.

No one is disputing the importance of military readiness, but recognition of that importance does not permit the parties or this court to ignore the MMPA.  Although MMPA provisions have been adjusted with respect to military activities, those adjustments do not permit the Navy to skirt the MMPA purely to avoid having its training and testing activities interrupted.  Focusing on the authorized take, this court therefore turns to the bases of NMFS's "negligible impact" finding to determine whether that finding is supportable.

> ## 2. NMFS Failed To Analyze the Effects of Authorized Takes on Many Affected Species and Stocks.

The MMPA requires examination of the impact of the activities in issue not only on affected species, but also on affected stocks of marine mammals.  A "stock" refers to a group of marine mammals within a species, such as the Island of Oahu's stock of bottlenose dolphins, or the California coastal stock of bottlenose dolphins.  See 16 U.S.C. § 1362(11) ("The term

'population stock' or 'stock' means a group of marine mammals of the same species or smaller taxa in a common spatial arrangement, that interbreed when mature.").

Conservation Council and NRDC contend that NMFS's "negligible impact" finding is arbitrary and capricious because NMFS failed to address the effects of authorized take on all the marine mammal species and stocks affected. This court agrees.

The requirement that NMFS examine the effect on every species and stock affected is contained in the statutory provisions permitting the taking of marine mammals of a species or population stock upon a finding that the authorized taking "will have a negligible impact on *such species or stock* and will not have an unmitigable adverse impact on the availability of such species or stock for subsistence uses." 16 U.S.C. § 1371(a)(5)(A)(i) (emphasis added). Notwithstanding this statutory requirement, the court is unable to locate in the voluminous administrative record a discussion of all the affected species and stocks.

NMFS did prepare a "Five-Year Regulation" or Final Rule, and that document does contain a section with the heading "Species-Specific Analysis." ECF No. 66-19, PageID #s 10249-52. However, despite its promising heading, that section overlooks numerous species and stocks.

The "Species-Specific Analysis" includes a subsection on "mysticetes" that mentions "humpback, blue, Western North Pacific gray, fin, and sei whales" without including a separate discussion of the effects on the population of each. There is a discussion of humpback whale activity around Hawaii and the Navy's agreement to limit its activities in the designated Humpback Whale Cautionary Area. There is also a reference to the use of waters in the Southern California portion of the HSTT Study Area as a summer feeding ground by the California, Oregon, Washington stock of humpback whales. This cursory reference by no means corresponds to a review of the effect of the Navy's activities on that stock. The report also says that feeding areas for fin and blue whales overlap the SOCAL Range Complex but asserts that major training events are not typically planned there and that the whales are large enough to be easily avoided.

Without analyzing the content of each subsection within the "Species-Specific Analysis" section, the court notes that the subsections cover sperm whales, pygmy and dwarf sperm whales, Dall's porpoise, beaked whales, false killer whales, short-beaked common dolphins, California sea lions, northern fur seals, northern elephant seals, and Hawaiian monk seals. Conservation Council complains that NMFS never discusses stocks of Guadalupe fur and harbor seals; bottlenose, Fraser's, long-beaked common, northern right whale, Pacific white-sided, pantropical spotted,

Risso's, rough-toothed, spinner, and striped dolphins; and killer, pygmy killer, short-finned pilot, and melonheaded whales. ECF No. 78, PageID # 14004.

Defendants point to two pages of NMFS's Final Rule preceding the "Species-Specific Analysis," see ECF No. 66-19, PageID #s 10248-49, but those pages do not explain NMFS's determination that authorized take would have a negligible impact on the species and stock not mentioned in the "Species-Specific Analysis." Defendants also cite to large portions of NMFS's Proposed Rule, but many of the pages cited are irrelevant to the present inquiry. The pages that bear some relevance discuss the potential effects of impulsive and nonimpulsive sound sources and vessel strike on marine mammals, but do not examine, with specific reference to the Navy's proposed activities, what impact those potential effects may have on annual rates of recruitment and survival of affected species and stock. See ECF No. 66-10, PageID #s 9902-16.

This court is not saying that an agency may never group stocks in considering the effects of a proposed activity. The court can certainly envision the possibility that, if a certain species typically reacts to a certain stimulus in a certain manner, an agency may have a basis for assuming that members in different stocks of that species will react similarly. That is, if, for example, a certain species of whale typically leaves an

25

area when sonar signals are emitted at a certain distance, level, and volume, there may be no reason for an agency to have to discuss reactions stock-by-stock. That does not mean, however, that the analysis of population effects may be grouped, as it is unlikely that different stocks of the same species will share the same population numbers, or have identical sex, age, and reproduction statistics such that the effects of an activity on the different stock populations can be assumed to be identical.

The clearest evidence that NMFS failed to consider the impact of the Navy's activities on all the affected species and stocks is ironically contained in the chart it submitted in response to an order requiring that Defendants provide specific record references by species and stock to show that NMFS did indeed consider the effect of the Navy's activities on all affected species and stocks. See ECF No. 95. With respect to the stocks not addressed in NMFS's "Species-Specific Analysis," NMFS provides record references to only general discussions with little, if any, relevance to the population-level effects on specific species and stock, and to conclusory statements that no such effects are expected. This is nothing short of an admission that many stocks and species lack discussions in the record about the effects of the proposed Navy activities on them specifically. See, e.g., ECF No. 95-1, PageID #s 14543-53 (citing exactly the same 10 pages in the administrative record for 25 stocks,

including stocks from different species, with frequent direction for the reader looking at the chart entry for one stock to see the chart entry for another stock).

The chart is particularly notable for highlighting how little attention NMFS gave to the effect on the populations of affected species and stocks of the mortalities the Navy was asking NMFS to authorize. In the chart, NMFS cites to brief discussions in the administrative record of mortalities of short-beaked common dolphins, Northern elephant seals, and California sea lions by explosion, stating for each that lethal takes "would be unlikely to have measurable long-term consequences" because the stock consists of hundreds of thousands of animals. See ECF No. 64-22, PageID #s 5684, 5686, 5694, 5695; see also id. at PageID #s 5698, 5704. For the remaining species and stocks affected by lethal takes, NMFS cited to no analysis at all of the population-level effects of lethal takes.

That NMFS cannot point to where it analyzed the impact of at least deaths on all species and stocks is particularly troubling to the court. The court can no more find the rationale for NMFS's conclusion that "any mortalities that do occur up to the maximum authorized levels would have a negligible impact on marine mammal species or stocks," ECF No. 68 at PageID # 13500, than it can find the rationale for NMFS's almost identical statement that "any resulting impacts to individuals are not

27

expected to affect annual rates of recruitment or survival," ECF No. 66-19, PageID # 10250. The most Defendants do is cite pages of NMFS's Final Rule, ECF No. 66-19, PageID #s 10248-49, that are silent with respect to numerous species and stocks. Thus, the court cannot determine from the pages Defendants cite why NMFS concluded, for example, that the fifteen large whale mortalities authorized will have a negligible impact on the whale species affected. This failure is especially puzzling in light of NMFS's recognition that "[t]he death of a female of any of the large whale species would result in a reduced reproductive capacity of the population or species." ECF No. 67-19, PageID # 12661.

NMFS must "articulate[] a rational connection between the facts found and the choices made." Arrington, 516 F.3d at 1112 (internal quotation marks omitted). While not concluding that the discussions of the species and stocks mentioned in the "Species-Specific Analysis" are adequate, the court has no hesitation in saying that, when NMFS does not actually analyze the impact on certain species and stocks, NMFS does not satisfy its burden of showing how it reached its conclusions with respect to those species and stocks. The court is left unable to determine how NMFS could conclude what impact the Navy's activities would have on the recruitment or survival of those species and stocks.

For species and stocks that are at least mentioned, this court sees no reason to examine whether NMFS sufficiently considered the impact of the proposed Navy activities on them. That is because it is not clear that the Navy would even have applied for authorization to take only those species and stocks. The Navy knew that its proposed activities would likely affect more than those species and stocks, and authorization to take fewer than all affected species and stocks would not likely have sufficed for the Navy's purposes.

NMFS's failure to explain the bases of its conclusion with respect to all species and stocks affected renders its "negligible impact" findings arbitrary and capricious. See Ctr. For Biological Diversity v. Kempthorne, 588 F.3d 701, 710 (9th Cir. 2009) ("A negligible impact finding is arbitrary and capricious under the MMPA . . . if the agency . . . entirely failed to consider an important aspect of the problem." (internal quotation marks omitted)).

The court understands that NMFS may not have readily available data for each stock. Even if, as NMFS argues, it has no duty to create such data, it can hardly justify concluding that the Navy's activities will have only a "negligible impact" on every stock, much less justify setting stock-specific authorized take levels, if it has no information on which to base such a conclusion or authorized take level. That is clearly

arbitrary and capricious.  Having made "negligible impact"
findings and set authorized take levels for all affected species
and stocks without articulating its bases, NMFS acted arbitrarily
and capriciously.

### 3.    NMFS Failed to Use the "Best Scientific Evidence Available."

Under 50 C.F.R. § 216.102(a), NMFS was required to use
the "best scientific evidence available" in making its finding of
"negligible impact."  NMFS acted arbitrarily and capriciously in
failing to use the best scientific evidence available.

Conservation Council and NRDC point to more than one
kind of scientific evidence that they complain NMFS should have
relied on but ignored.  In this order, this court zeroes in on
one particular kind of evidence that NMFS disregarded:  evidence
of "Potential Biological Removal" ("PBR") levels.  A PBR level is
defined in the MMPA as "the maximum number of animals, not
including natural mortalities, that may be removed from a marine
mammal stock wile allowing that stock to reach or maintain its
optimum sustainable population."  16 U.S.C. § 1362(20); see ECF
No. 78, PageID #s 14007-08.  NMFS authorized the Navy to kill
marine mammals in 15 stocks at levels much higher than their PBR
levels.  Because any mortality level that exceeds PBR will not
allow the stock to reach or maintain its optimum sustainable
population ("OSP"), such a mortality level could not be said to
have only a "negligible impact" on the stock.

Indeed, the MMPA provides that "species and population stocks . . . should not be permitted to diminish below their optimum sustainable population." 16 U.S.C. § 1361(2). See also 54 Fed. Reg. at 40,341, 40,342 ("In order to make a negligible impact finding, the proposed incidental take must not prevent a depleted population from increasing toward its OSP." . . . "If a particular stock were known to be within its OSP range, then the Service believes a finding of negligible impact can only be made if the permitted activities are not likely to reduce that stock below its OSP. However, not all takings that do not reduce the population below its OSP would be considered negligible.").

In 1999, NMFS itself developed criteria for comparing incidental mortality levels to PBR levels in the fisheries context. Those criteria provided, "If total fisheries related serious injuries and mortalities are greater than PBR, permits may not be issued." 64 Fed. Reg. 28,800-01 (May 27, 1999). Conservation Council argues that NMFS should have used those criteria in setting authorized mortality levels for the marine mammals that would be affected by the Navy's activities. Disregarding PBR, NMFS set authorized mortalities at levels higher than PBR for 15 stocks, some of them involving endangered whales.

This is one of the instances alluded to earlier in this order in which the issue is best understood by examination of specific details.  The court therefore includes here a chart prepared by Conservation Council:

| Stock | PBR | Authorized Annual Mortality |
|---|---|---|
| Endangered fin whale, Hawaiʻi | 0.2 | 3 |
| Endangered sei whale, E. N. Pacific | 0.17 | 3 |
| Endangered sei whale, Hawaiʻi | 0.1 | 3 |
| Endangered sperm whale, CA/OR/WA | 1.5 | 3 |
| Bryde's whale, Hawaiʻi | 3.3 | 6 |
| Minke whale, CA/OR/WA | 2.0 | 6 |
| Bottlenose dolphin, California Coastal | 2.4 | 23 |
| Bottlenose dolphin, CA/OR/WA offshore | 5.5 | 17 |
| Bottlenose dolphin, Oʻahu | 3.9 | 8 |
| Bottlenose dolphin, 4-Islands region | 1.3 | 8 |
| Bottlenose dolphin, Kauaʻi/Niʻihau | 1.3 | 8 |
| Bottlenose dolphin, Hawaiʻi Island | 0.9 | 8 |
| Spinner dolphin, Hawaiʻi Island | 6.9 | 8 |
| Spinner dolphin, Oʻahu/4-Islands | 3.3 | 8 |
| Spinner dolphin, Kauaʻi/Niʻihau | 5.1 | 8 |

ECF No. 78, PageID # 14009.

As shown by the chart included here, NMFS authorized an annual mortality for the Hawaii stock of endangered sei whales of 3, which was 30 times the PBR level of 0.1. NMFS authorized an annual mortality of 8 for the Hawaii Island stock of bottlenose dolphins, which was nearly 9 times the PBR level of 0.9. Confusingly, the number 8 was the same number of deaths authorized for the Oahu stock of bottlenose dolphins, which had a PBR of 3.9.

Defendants respond to the PBR-related argument in two ways.

First, Defendants raise procedural arguments, contending that the matter is not properly before this court. They note, for example, that nothing about PBR levels is mentioned in any iteration of the Complaints filed by Conservation Council or NRDC. See ECF No. 68, PageID # 13501. The court is unpersuaded by this contention.

Conservation Council's pleading asserts that NMFS "failed to perform any scientifically valid analyses to determine whether the authorized take levels would have only a negligible impact on each of the affected species or stocks." ECF No. 41, PageID # 366. This allegation put Defendants on notice that Conservation Council was challenging NMFS's scientific analysis in evaluating authorized take. Conservation Council was not required to refer expressly to PBR levels to satisfy the

34

requirement in Rule 8(a) of the Federal Rules of Civil Procedure that its complaint contain a short and plain statement of its claims.

Similarly, NRDC alleged in its pleading, "The Service's issuance of a Final Rule and Letters of Authorization permitting the take of marine mammals incidental to the Navy exercises challenged here violates the requirements of 16 U.S.C. § 1371 and its implementing regulations.  The Service failed, among other things, to consider the best available scientific information, and to properly analyze the information it did consider, when it concluded that the requested takes of beaked whales, endangered blue whales, and other marine mammals will have a negligible impact on those species or stocks."  ECF No. 40, PageID # 310. This allegation gave Defendants sufficient notice that NRDC was challenging NMFS's purported use of the best available scientific information.  Rule 8(a) did not require further allegations by NRDC on this point.

In another try at raising a procedural bar, Defendants contend that even if Conservation Council and NRDC properly pled the PBR argument, they may not raise the PBR issue here because they did not mention PBR when they commented on NMFS's Proposed Rule.  See ECF No. 68, PageID # 13501; ECF No. 71, PageID # 13625.  Once again, this court is unpersuaded.  Defendants' reliance on the doctrine of waiver is noticeably lacking any

suggestion that allowing Conservation Council and NRDC to advance the PBR argument at this time would take Defendants by surprise or somehow unfairly prejudice Defendants. NMFS had independent knowledge of PBR levels, which were actually discussed during the administrative process, although ultimately disregarded. See ECF No. 66-27, PageID # 10309; ECF No. 66-20, PageID #s 10262-64; see also ECF No. 68, PageID # 13501 (Defendants concede that "agency staff discussed PBR during the rulemaking"). NMFS's awareness of this issue precludes any reliance on waiver. See 'Ilio'ulaokalani Coal. v. Rumsfeld, 464 F.3d 1083, 1093 (9th Cir. 2006) (plaintiffs did not waive challenge when agency "had independent knowledge of the very issue that concern[ed] Plaintiffs"); see also Today's IV, Inc. v. Fed. Transit Admin., No. LA CV13-00378 JAK, 2014 WL 3827489, at *14-15 (C.D. Cal. May 29, 2014); Ctr. for Food Safety v. Vilsack, No. C 08-00484 JSW, 2009 WL 3047227, at *6 (N.D. Cal. Sept. 21, 2009). NMFS even used stock assessment reports from 2012 in considering the Navy's take request. See ECF No. 66-19, PageID # 10214. Those reports contain PBR levels for stocks affected by the Navy's activities. See ECF No. 64-4.

Besides making procedural arguments, Defendants make the substantive argument that NMFS is not restricted by PBR levels. Defendants view Conservation Council and NRDC as premising their PBR arguments on the understanding that "Congress

intended for PBR to limit NMFS's authority to permit take under section 101(a)(5)(A)."  ECF No. 68, PageID #s 13501-02.  The court does not view either Conservation Council or NRDC as arguing congressional intent at all.  Instead, the court views them as pointing out that NMFS, having itself treated PBR as the best scientific evidence available, is acting arbitrarily and capriciously in disregarding PBR with respect to the Navy's request.

Although Defendants protest that PBR "was added to the MMPA as a fisheries management tool, not as a limit on NMFS's authority under Section 101(a)(5)(A)," see ECF No. 68, PageID # 13502, NMFS itself has not restricted its reliance on PBR criteria to the fisheries context.  Thus, NMFS said in examining an application in a different case, "because NMFS has determined that the loss of even a single northern right whale is significant (i.e., greater than PBR), a negligible impact finding under section 101(a)(5)(A) cannot be made for ship strikes of northern right whales by the USCG."  61 Fed. Reg. 54,157-58 (Oct. 17, 1996).

NMFS's past reliance on PBR criteria in the context of making a "negligible impact" finding under 16 U.S.C. § 1371(a)(5)(A) makes sense given the very definition of PBR and the specific mention of optimum sustainable population in relevant statutes.  If a whale is killed, the impact on the

population of the species or stock is the same whether the death occurs during fishing activities or during a Navy exercise. Clearly PBR levels were available for at least some of the stocks in issue, as shown by Conservation Council's chart, included in this order. Given the connection between OSP, PBR, and the negligible impact analysis, NMFS cannot reasonably authorize mortalities without any mention of PBR. NMFS's failure to evaluate lethal takes against PBR violated the requirement that NMFS utilize the best scientific evidence available.

While Defendants argue that NMFS would have made the same "negligible impact" finding even if it had compared lethal takes to PBR levels, this "it makes no difference" argument is irrelevant to this court's review. As noted earlier in this order, NMFS was required to "articulate a rational connection between the facts found and the choices made." Arrington, 516 F.3d at 1112 (internal quotation marks omitted). A failure in that regard is not rendered inconsequential by an after-the-fact explanation. If after-the-fact explanations sufficed, agencies would never have to explain their decisions to start with. In this instance, NMFS's failure to discuss PBR in issuing the Final Rule invalidates NMFS's conclusion.

Given the importance of the PBR issue, this court sees no need to address other alleged deficiencies in the scientific evidence that Conservation Council and NRDC complain about in the

context of their MMPA challenges.  Some of those other challenges

appear to require this court to substitute its own judgment for

NMFS's judgment as to what study to rely on, without giving

deference to NMFS, or to find contradictions that are less than

obvious to this court.  The deficiencies growing out of a total

failure to consider clearly important information are glaring

enough that the court finds it unnecessary to make judgment

calls.

The court is not unmindful of the efficiencies that

might be achieved by having this court opine on every failing

Conservation Council and NRDC charge NMFS with.  If NMFS issues a

new Final Rule and new LOAs, knowledge of a court's view of all

failings alleged might avoid a repetition of problems.  But in

this case, the problems this court identifies are so fundamental

that the court cannot conceive of a new Final Rule or new LOAs

that simply tweak the earlier documents and regurgitate old

language.  If NMFS addresses the matters identified here, any new

Final Rule or new LOAs will need to be so completely different

from existing documents that present issues should be irrelevant.

### 4.    NMFS's Analysis of Mitigation Measures is Arbitrary and Capricious.

NRDC argues that NMFS also acted arbitrarily and

capriciously in its cursory analysis of ways to mitigate the

negative effects of the Navy's activities on affected species and

stocks.  This court agrees.

Before authorizing the Navy's incidental taking of marine mammals under the MMPA, NMFS was required to prepare regulations setting forth "permissible methods of taking pursuant to such activity, and *other means of effecting the least practicable adverse impact on such species or stock and its habitat*, paying particular attention to rookeries, mating grounds, and areas of similar significance, and on the availability of such species or stock for subsistence uses."  <u>See</u> 16 U.S.C. § 1371(a)(5)(A)(i)(II)(aa)  (emphasis added).

NRDC contends that NMFS failed to prescribe means of effecting the "least practicable adverse impact" on affected species and stocks.  Notably, NRDC says, NMFS outlines no mitigation measures that adequately address significant behavioral disruptions and imposes no time/area restrictions on the Navy's activities other than in the Humpback National Marine Sanctuary.  <u>See</u> ECF No. 75, PageID #s 13845-49.

Defendants respond that NMFS met its statutory obligation by "prescrib[ing] a suite of mitigation designed to avoid the most serious impacts on marine mammals that could lead to population-level harm."  ECF No. 71, PageID # 13629.  NMFS's "suite of mitigation" consists primarily of using lookouts and "mitigation zones," and of requiring the powering down or shutting down of acoustic sources when a marine mammal is detected within certain proximities.  <u>See</u> ECF No. 66-19, PageID

40

#s 10256-57.  NMFS claims to have reasonably found that behavioral disturbances outside of mitigation zones are not likely to result in population-level harm.  ECF No. 71, PageID # 13630.  Defendants also argue that the MMPA contains no "mandate" requiring time/area restrictions, and that NRDC has failed to establish that time/area restrictions "are the only means by which NMFS can achieve the least practicable adverse impact." Id. at PageID # 13631.

This court agrees with Defendants that NRDC neither shows that there is a "mandate" in the MMPA for time/area restrictions nor establishes that time/area restrictions are the only means of achieving the "least practicable adverse impact." However, this court notes that, for their part, Defendants cite no authority for their suggestion that avoiding the most serious impacts satisfies the statutory requirement that Defendants set forth measures for effecting the "least practicable adverse impact."

Moreover, Defendants appear to think that they satisfy the statutory "least practicable adverse impact" requirement with a "negligible impact" finding.  See ECF No. 71, PageID # 13630 ("NRDC first argues that NMFS failed to prescribe sufficient mitigation to 'mitigate the harm to populations' from Level B behavioral disturbances occurring outside the mitigation zones. . . . . This argument fails because NMFS reasonably found that

behavioral disturbances are not likely to cause population-level harm. *Supra* 4-22."). But if one could conflate the two, the "least practicable adverse impact" requirement would become no reqirement at all. And, of course, this court has determined that, among other things, NMFS's failure to address the effect of the Navy's activities on all affected species and stocks renders its "negligible impact" finding arbitrary and capricious.

This court is not here ruling that time/area restrictions are necessarily required to meet the "least practicable adverse impact" provision of the MMPA. But, whether with or without time/area restrictions, something more than a refusal to consider mitigation measures and an unexplained assertion that further mitigation is not practical is needed. That "something more" is lacking here.

For example, when it received public comments recommending that the ocean on the leeward side of the Island of Hawaii out to a depth of 3,281 yards be excluded from the Navy's activities, NMFS acknowledged that there was evidence "suggesting that several resident populations of marine mammals may be present off the leeward side of Hawaii." ECF No. 66-19, PageID # 10224. NMFS's response was that, given the very low historical level of Navy activities in the area, time/area restrictions "would not further reduce the likelihood or magnitude of adverse impacts" and "are not necessary at this point." Id. NMFS said

it would revisit the matter if future reports suggested that increased Navy operations were overlapping with the resident marine mammal populations. Id. This is not a response consistent with the requirement that NMFS set forth regulations for the "least practicable adverse impact." In the first place, a history of low Navy activity does not demonstrate that time/area restrictions or, for that matter, other restrictions, in that area are impractical. Second, because there is no guarantee concerning the future level of Navy activities, NMFS's "wait and see" approach puts the marine mammals at risk of sustaining adverse impacts before the authorization provided by NMFS may be revisited. NMFS does not explain why, if the Navy's activity level in the area was low, NMFS did not impose restrictions that would have been unlikely to affect the Navy, instead of freeing the Navy to increase its activities.

Similarly, in response to public comment suggesting restrictions in areas off California important to large whales, NMFS acknowledged that the SOCAL Range Complex contains important areas for fin and blue whales, but said that "these areas are . . . adjacent to the Navy's only west coast underwater instrumented training range" and that the Navy "indicated that establishment of a time-area closure within this region is not practical." Id. at PageID # 10229. Although NMFS must consider "personnel safety, practicality of implementation, and impact on the

effectiveness of the military readiness activity" in evaluating the least practicable adverse impact, NMFS must explain its conclusion as to why a "time-area closure within this region is not practical." NMFS only summarizes the Navy's indication of impracticality without analyzing it at all. NMFS cannot just parrot what the Navy says. If NMFS is accepting the Navy's position, NMFS must articulate a rational basis for that decision. NMFS does not meet the "least practicable adverse impact" requirement when it just repeats the Navy's position.

NMFS does impose restrictions in the Humpback National Marine Sanctuary, but provides no explanation as to why no other time/area restrictions are practicable. At most, Defendants note that humpback whales are endangered and "[i]t is reasonable to treat an area of importance to an endangered species differently than an area that may hold resident populations of larger, non-listed stocks." ECF No. 71, PageID # 13633. This rationale is not included in the Final Rule. More importantly, NMFS's obligation to impose measures ensuring the "least practicable adverse impact" applies with equal force to endangered and unendangered species and stocks. The HSTT Study Area covers millions of square nautical miles, and the court has a hard time assuming that absolutely no other time/area restriction is practicable in that vast area.

The court repeats its statement that it is not saying that the only way an agency can avoid being arbitrary and capricious with respect to the "least practicable adverse impact" requirement is to impose time/area restrictions.  But if time/area restrictions are indeed practicable and NMFS chooses not to impose them when the Navy proposes to engage in, for example, sonar exercises, then NMFS must consider measures of equivalent effect, given the "weight of scientific evidence point[ing] to avoidance of marine mammal habitat as the most effective means of minimizing sonar-related injury to marine mammals."  See Ocean Mammal Inst. v. Gates, 546 F. Supp. 2d 960, 992 (D. Haw. 2008).  NMFS may not satisfy its obligation by the use of lesser options such as lookouts and mitigation zones without considering the practicability of other measures, especially knowing that many potential disruptions to marine mammal behavior will be difficult to detect or avoid through lookouts.

No one is saying that every adverse impact must be avoided.  But the "least practicable adverse impact" requirement is part of "a stringent standard" that Congress deliberately imposed on agencies like NMFS.  Evans, 279 F. Supp. 2d at 1159. "Although the agency has some discretion to choose among possible mitigation measures, it cannot exercise that discretion to vitiate this stringent standard."  Id.  NMFS treats the standard

as if it requires almost no effort at all.  This reads the words "least practicable adverse impact" out of the MMPA and is therefore arbitrary and capricious.

Given NMFS's failure to consider authorized takes, to analyze the impact of the Navy's activities on all affected species and stocks of marine mammals, to use the best scientific evidence available, and to prescribe means of effecting the "least practicable adverse impact" on affected species and stocks, this court concludes that MMPA requirements have not been met and that NMFS's finding that Navy activities will have only a "negligible impact" on affected species and stocks is arbitrary and capricious.

**B.    NMFS's Biological Opinion Does Not Satisfy the ESA.**

Conservation Council and NRDC also challenge NMFS's Biological Opinion as failing to satisfy the ESA.  This court concludes that the Biological Opinion is deficient with respect to including an arbitrary and capricious "no jeopardy" finding for whales and including an invalid incidental take statement and "no jeopardy" finding for turtles.

**1.    The Court Declines Defendants' Request To Stay the Challenges to the Biological Opinion.**

Before turning to the contents of the Biological Opinion, this court addresses Defendants' request that this court dismiss or stay the ESA claims in light of the reinitiation of

consultation by NMFS and the Navy to "reconsider their analyses, while giving 'careful consideration to issues . . . recently raised in litigation.'" ECF No. 68, PageID # 13505. According to Defendants, the agencies "have agreed to conclude the consultation by April 3, 2015." Id.

The court declines to dismiss or stay the ESA claims. Although Defendants characterize the ESA claims as "anticipatorily moot," this court is not required to dismiss or stay a live controversy simply because it may become moot in the future. See Hunt v. Imperial Merch. Servs., Inc., 560 F.3d 1137, 1142 (9th Cir. 2009). A court may, of course, "allow agencies to cure their own mistakes rather than wasting the courts' and the parties' resources reviewing a record that both sides acknowledge to be incorrect or incomplete." S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv., No. 2:13-CV-00042-MCE, 2013 WL 4094777, at *9 (E.D. Cal. Aug. 13, 2013). However, Defendants have not acknowledged that the Biological Opinion is deficient in any specific manner and instead say only that they plan to give "careful consideration to issues . . . recently raised in litigation" and "address these issues, if appropriate, in the new [Biological Opinion]." ECF No. 68, PageID # 13505 (emphasis added)(internal quotation marks and brackets omitted).

During their reinitiated consultation, NMFS and the Navy are continuing to rely on the Biological Opinion challenged

in this action.  It makes no sense to this court to grant a
dismissal or stay if Defendants can continue to actively rely on
the existing Biological Opinion.  Such an action by this court
would be advantageous to Defendants while treating Conservation
Council and NRDC as if they had never brought an ESA challenge at
all.  The court recognizes that Defendants' promised April 3
completion date is almost here, but the court must rule in any
event on the MMPA and NEPA claims.  This court might take a
different view of the stay request if Defendants were offering to
suspend their reliance on the existing Biological Opinion during
the reinitiated consultation period, but that is not an offer
Defendants have made.

### 2. NMFS's "No Jeopardy" Finding for Whales is Arbitrary and Capricious.

NMFS's Biological Opinion concludes that authorized
mortalities of large whales will not appreciably reduce the
likelihood of both the survival and recovery of affected large
whale species in the wild.  Because NMFS does not support this
conclusion with adequate evidence or analysis, this "no jeopardy"
finding is arbitrary and capricious.

The "no jeopardy" finding flows from NMFS's repeated
conclusory statements.  This does not satisfy the ESA.

For example, NMFS recognized that blue whales, fin
whales, humpback whales, sei whales, Western North Pacific grey
whales, and sperm whales could be killed or injured (including in

48

a manner affecting their ability to reproduce) if struck by Navy vessels. However, NMFS ignored the effects of individual whale deaths or injuries on the survival or recovery of the species or stocks. See ECF No. 67-19, PageID #s 12637-47. The failure to examine these effects is at odds with NMFS's own recognition in the Biological Opinion that "[w]hen individual animals would be expected to experience reductions in their current or expected future reproductive success, we would also expect those reductions to also reduce the abundance, reproduction rates, or growth rates . . . of the populations those individuals represent." Id. at PageID # 12371.

Similarly, for most of the large whale species at issue, NMFS simply states, "Removal of one or more individuals of a particular species from a population will have different consequen[c]es on the population depending on sex and maturity of the animal." Id. at PageID # 12638; see also id. at PageID #s 12640, 12643, 12644, 12647. Yet NMFS does not follow up with an examination of the potential consequences based on sex and maturity. Instead, NMFS announces without detail that the Navy's activities are not likely to reduce the fitness of individual whales, and so the activities are not likely to reduce the viability of affected whale populations. See id. at PageID #s 12638-39, 12640, 12643, 12644, 12647. A dead whale may not be an "unfit" individual, but would clearly have been removed from the

49

population.  Because NMFS recognizes that the impact of the
removal of one or more individuals depends on the sex and
maturity of the animal, it is unclear how NMFS can so easily
conclude that a removal is not likely to reduce the viability of
an affected whale population.

For Western North Pacific gray whales, NMFS says it
does "not expect any western North Pacific gray whales to be
involved in a ship strike event" because of "the low number of
western North Pacific gray whales in the HSTT Study Area."  ECF
No. 67-19, PageID # 12641.  But if Western North Pacific gray
whales are so scarce in the area, why does NMFS proceed to
authorize mortalities for that species and on what basis does
NMFS conclude that those mortalities in an area where the species
is low in number "would not appreciably reduce the Western North
Pacific gray whales' likelihood of surviving and recovering in
the wild"?  See id.

The "no jeopardy" finding is rendered further
perplexing by the recognition within the Biological Opinion
itself that "[t]he death of a female of any of the large whale
species would result in a reduced reproductive capacity of the
population or species."  Id. at PageID # 12661.  The "no
jeopardy" finding and that statement are not reconciled anywhere
in the Biological Opinion, despite NMFS's obligation to
"articulate[] a rational connection between the facts found and

50

the choices made." Arrington, 516 F.3d at 1112 (internal
quotation marks omitted).

Attempts by Defendants to shore up the "no jeopardy"
finding are unavailing. First, Defendants contend that NMFS's
"no jeopardy" finding must be valid given NMFS's "negligible
impact" finding, reached under a less demanding standard. See
ECF No. 68, PageID # 13509. Having invalidated NMFS's
"negligible impact" finding in analyzing the MMPA claims, this
court finds that argument unpersuasive.

Second, Defendants support the "no jeopardy" finding
for whales by pointing to statements in their opposition to the
summary judgment motions. See ECF No. 68, PageID # 13509. Those
statements assert the low risk of mortalities resulting from the
Navy's activities. See id. at PageID #s 13497-13504. As this
court noted in its discussion of MMPA issues, NMFS was required
to focus on what it was authorizing the Navy to take, not on what
the Navy said it anticipated it would actually take.

Conservation Council also argues that the Incidental
Take Statement for whales allows more mortalities than allowed by
the MMPA. However, that Incidental Take Statement is expressly
dependent on satisfaction of requirements for authorization under
the MMPA. The Biological Opinion could certainly have been
crafted more clearly with respect to the need for MMPA
authorization, but the court does not rely in the present order

on the contention that the Incidental Take Statement for whales allows excess mortalities. However, it happens, of course, that, because this court invalidates NMFS's "negligible impact" finding under the MMPA in the present order, the MMPA prerequisite in the Incidental Take Statement for whales is not satisfied. Because the ESA requires an Incidental Take Statement when an agency issues a "no jeopardy" finding, the absence of an Incidental Take Statement that satisfies all prerequisites represents a different problem under the ESA than the excess mortality issue.

In light of the court's overarching discussion concerning the Biological Opinion's "no jeopardy" finding as to whales, the court sees no need to reach the additional arguments raised by Conservation Council and NRDC relating to alleged deficiencies in the Biological Opinion concerning specific whale species or stocks. As this court noted in its MMPA discussion, when the court has identified flaws so fundamental to a document that the document needs to be totally rewritten, it makes little sense for this court to engage in fine-tuning. The "no jeopardy" finding for whales is arbitrary and capricious, and the Biological Opinion is therefore unsustainable with respect to whales.

**3. The "No Jeopardy" Finding for Turtles is Arbitrary and Capricious, and the Incidental Take Statement for Vessel Strikes of Turtles is Invalid.**

Just as troubling to the court as the Biological

Opinion's cursory discussion of whale mortalities is the manner in which turtles are addressed by NMFS for ESA purposes. The problem occurs with respect to the absence of analysis supporting the "no jeopardy" finding concerning turtles in the Biological Opinion, and to the uncapped number of turtle takes by vessel strike authorized in the Incidental Take Statement.

The Biological Opinion authorizes an "unspecified number" of turtle takes and includes a "no jeopardy" finding for turtles. Authorization of an "unspecified number" of takes necessarily means that NMFS is authorizing even mortalities that eliminate the entire ESA-listed turtle population. This cannot avoid being arbitrary and capricious.

Defendants point to what they say is the limited anticipated take, as opposed to the unlimited authorized take. This position remains unavailing. Authorizing the Navy to take an unlimited number of turtles makes it impossible for NMFS to justify a finding that the "action authorized. . . is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). The patent absurdity of the "no jeopardy" finding for turtles makes it unnecessary for this court to consider other arguments raised in support of the challenges to the Biological Opinion's "no jeopardy" finding for turtles.

Having found "no jeopardy," NMFS was required by the ESA to issue an Incidental Take Statement for turtles. Claiming that "it is very difficult to estimate the number and species composition of turtles that could be 'taken' in the HSTT Study Area in transit zones and range complexes," ECF No. 67-19, PageID #s 12658, 12660, NMFS placed no numerical cap at all on how many turtles may be taken as a result of vessel strikes during Navy activities. Instead, the Incidental Take Statement provides that "[t]ake will be exceeded if activity levels as proposed are exceeded." Id.

The Ninth Circuit has recognized Congress's clear "preference for expressing take in numerical form." Oregon Natural Res. Council v. Allen, 476 F.3d 1031, 1037 (9th Cir. 2007). If an Incidental Take Statement "utilizes a surrogate instead of a numerical cap on take," it "must explain why it was impracticable to express a numerical measure of take." Id.; see also Natural Res. Def. Council, Inc. v. Evans, 279 F. Supp. 2d 1129, 1184 (N.D. Cal. 2003) ("In the absence of a specific numerical value . . . the defendant must establish that no such numerical value could be practically obtained.").

In issuing an Incidental Take Statement without a numerical cap on the taking of turtles by vessel strike, NMFS did not show that it could not practically obtain a numerical value. NMFS did no more than say that it was "very difficult" to

54

estimate the take of turtles in the HSTT Study Area and make statements in the Biological Opinion such as, "The information available has not allowed us to estimate the probability of the different sea turtle[] species being exposed to . . . vessel traffic . . . associated with the activities the U.S. Navy plans to conduct in the HSTT Study Area."  ECF No. 67-19, PageID # 12631.  Such statements in effect repeat the mantra that it is "very difficult" to make an estimate.  See also ECF No. 67-19, PageID # 12535 ("[W]e do not have sufficient information to estimate how many sea turtles might be exposed to [vessel strike]."); id. at PageID # 12592 ("While the potential for serious injury and mortality of sea turtles from vessel strike exists, it is very difficult to estimate the number and species composition of turtles that could be taken in the HSTT Study Area in transit zones and range complexes.").  These are not explanations.  This "unexplained failure" by NMFS to comply with its obligation "renders the Incidental Take Statement invalid."  See Allen, 476 F.3d at 1038.

Even if NMFS could be said to have established that it could not provide a number, NMFS should have done more than it did to ensure that there were sufficient controls on the taking of turtles.  Specifically, when an Incidental Take Statement lacks a numerical trigger, the Incidental Take Statement must "set forth a 'trigger' that, when reached, results in an

unacceptable level of incidental take, invalidating the safe
harbor provision, and requiring the parties to re-initiate
consultation." Ariz. Cattle Growers' Ass'n v. U.S. Fish &
Wildlife, Bureau of Land Mgmt., 273 F.3d 1229, 1249 (9th Cir.
2001). That is, when a numerical limitation on take is not used,
there must be a surrogate that can "perform the functions of a
numerical limitation." Allen, 476 F.3d at 1038.

NMFS's authorization of an "unspecified number" of
vessel strikes on turtles and its statement that "[t]ake will be
exceeded if activity levels as proposed are exceeded," ECF No.
67-19, PageID #s 12658, 12660, do not perform the functions of a
numerical limitation. The Incidental Take Statement does not
"set forth a 'trigger' that, when reached, results in an
unacceptable level of incidental take." Ariz. Cattle Growers'
Ass'n, 273 F.3d at 1249. Instead, no matter how many turtles are
taken by vessel strike within the scope of the project, the Navy
and NMFS will not be required to reinitate consultation. This
failure to provide for the reinitiation of consultation
invalidates the Incidental Take Statement for vessel strikes of
turtles.

Defendants appear to be suggesting that the Incidental
Take Statement does indeed have numerical limitations for takes
in the form of numbers for Permanent Threshold Shift (i.e.,
permanent hearing loss). Defendants say that NMFS assumed that

turtles close enough to vessels to be at risk of permanent hearing loss were also vulnerable to ship strike, and that, because numbers for Permanent Threshold Shift were stated, those numbers functioned as limits on takes by vessel strike and thus as triggers for reinitiation of consultation. See ECF No. 68, PageID # 13512 (referring to ECF No. 67-19, PageID # 12535).

This argument is not supported by the record. If NMFS had meant to have the numerical cap for Permanent Threshold Shift serve as the cap for vessel strike takes, NMFS would not have authorized an "unspecified number" of turtle takes by vessel strike. In addition, Defendants have elsewhere stated that "PTS is not a good surrogate" for vessel strikes and that "the modeled PTS estimates cannot serve as a means of quantifying sea turtle vessel strikes in this case." ECF No. 88, PageID #s 14348, 14349.

This court concludes that the Incidental Take Statement for vessel strikes of turtles is invalid.

### C. The FEIS Fails To Comply with NEPA.

Conservation Council challenges the FEIS prepared by the Navy and adopted by NMFS under NEPA on the grounds that the FEIS arbitrarily and capriciously fails to analyze a true "no action" alternative and fails to analyze alternatives with less environmental harm. See ECF No. 78, PageID #s 14027-37. This court agrees in both respects.

### 1. The FEIS Fails To Consider a "No Action" Alternative.

In examining the "environmental impacts of the proposal and the alternatives in comparative form," an EIS must "[i]nclude the alternative of no action." 40 C.F.R. § 1502.14. Conservation Council contends that the "no action" alternative considered in the FEIS is not truly a "no action" alternative because it presumes approval of the requested MMPA authorizations and continuation of "currently conducted training and testing activities (baseline activities) and force structure (personnel, weapons and assets) requirements." ECF No. 65-5, PageID # 6980. Conservation Council complains that the FEIS should have examined a "no action" alternative based on denial of the requested MMPA authorizations. See ECF No. 78, PageID # 14028.

The FEIS analyzed the following alternatives: (1) the continuation of baseline activities (what the FEIS termed the "No Action Alternative"); (2) the "[o]verall expansion of the Study Area plus adjustments to types and levels of activities, from the baseline as necessary to support current and planned Navy training and testing requirements" ("Alternative 1"); and (3) "Alternative 1 plus the establishment of new range capabilities, modifications of existing capabilities, and adjustments to type and levels of training and testing" ("Alternative 2"). ECF No. 65-5, PageID # 6980.

All three alternatives describe the Navy's training and
testing activities, rather than being driven by the effect of
authorizing the taking of marine mammals that the Navy was
requesting.  While the level of the Navy's activities relates to
the level of take NMFS might authorize, it was certainly not
NMFS's task to determine what training or testing activities the
Navy should engage in.  See, e.g., ECF No. 88, PageID # 14350-51
(Defendants' statement that, if NMFS had not acted on the Navy's
requests, it would have been left to the Navy, not NMFS, "to
pursue alternative MMPA compliance arrangements"); see also ECF
No. 78, PageID # 14029 (Defendants not suggesting that NMFS had a
duty to fashion alternative activities for the Navy in the
absence of NMFS authorizations and instead saying that the Navy
would have presumably modified its activities); ECF No. 80,
PageID # 14236 (no basis for "suggestion that denial of take
authorizations would preclude all Navy activities").

NMFS's job was to determine whether to authorize the
takes requested by the Navy.  It is therefore disturbing that the
alternatives studied in the FEIS are all descriptions of
different levels of Navy activity.  This may be the result of the
Navy's preparation of the FEIS, but NMFS was not required to
adopt the Navy's document as NMFS's "NEPA documentation for the
rule-making process under the MMPA."  ECF No. 65-6, PageID #
6831.

The FEIS's alternatives avoid the task actually facing NMFS. In assuming that, no matter what, Navy activities would surely occur, NMFS was neglecting to consider what would be a true "no action" alternative from NMFS's perspective. The Navy and NMFS appear to have recognized that a "no action" alternative from NMFS's perspective might well have been the scenario in which, under the MMPA, NMFS denied the Navy's request for an incidental take authorization. NMFS was aware that "for NMFS, this constitutes the NEPA-required No-Action Alternative." See ECF No. 66-24, PageID # 10290. An agency decision memorandum states that the FEIS, despite failing to consider this alternative, nevertheless "supports [its] analys[i]s." Id. The reasons for that support are unstated.

With what it called a "no action" alternative, NMFS was assuming the very take activities the Navy was proposing to engage in. This is a glaring deficiency in the FEIS.

### 2. The FEIS Fails To Sufficiently Consider Alternative Restrictions on Navy Activities.

An EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). "Judicial review of the range of alternatives considered by an agency is governed by a 'rule of reason' that requires an agency to set forth only those alternatives necessary to permit a 'reasoned choice.'" California v. Block, 690 F.2d 753, 767 (9th Cir. 1982). An EIS's range of reasonable alternatives is

necessarily tethered to the stated goal of the project.  City of
Carmel-By-The-Sea v. U.S. Dep't of Transp., 123 F.3d 1142, 1155
(9th Cir. 1997).

An agency is required to assess and consider public
comments to an EIS.  In response to those comments, an agency may
"[d]evelop and evaluate alternatives not previously given serious
consideration by the agency" or "[e]xplain why the comments do
not warrant further agency response, citing the sources,
authorities, or reasons which support the agency's position."  40
C.F.R. § 1503.4.  The record contains no evidence that, in
response to public comments, the Navy itself developed
alternatives not previously given serious consideration.  The
Navy instead restricted itself to discussing what others were
suggesting.  The court therefore turns to addressing whether that
discussion met NEPA's requirement that the Navy take a "hard
look" at the environmental consequences of its proposed actions.
See Earth Island, 351 F.3d at 1300.  The Navy took no such "hard
look," and, in adopting the FEIS, NMFS similarly failed to
satisfy NEPA.

Conservation Council identifies what it says were
"[n]umerous commenters" who "urged the Navy to consider
alternatives that would reduce harm to marine mammals by
prohibiting or restricting HSTT activities in specific areas
identified as biologically important."  See ECF No. 79 at PageID

61

#s 14049-50.  Public comments suggested time/area restrictions on the Navy's activities in blue and fin whale foraging areas, in the Catalina Basin, in the Blainville's beaked whale habitat west of the Big Island, and in the Hawaii insular false killer whale habitat between east Oahu and north Maui and off Hawaii Island, among other places.  See ECF No. 63-17, PageID # 4143; ECF No. 63-20, PageID #s 4177-78.  The Navy's main response was that it was impractical to require that the Navy avoid all marine species habitats.  ECF No. 65-8, PageID # 88465.  This was not a fair response to those public comments, as the comments were not seeking total avoidance.

The Navy also said in the FEIS that "[l]imiting training and testing activities to specific locations . . . would be impractical" and provided a number of reasons for that impracticality, including: (1) the necessity of using "the diverse and multidimensional capabilities of each range complex and testing range" to "develop and maintain high levels of readiness"; (2) the safety concerns presented by "requiring activities to take place in more remote areas where safety support may be limited"; (3) the impact access restrictions would have on the Navy's "ability to adapt training" and to "evolve as the threat evolves"; (4) the negative effect of restrictions on the "realism of training"; and (5) the "increase [in] transit time" resulting in "an increased risk to personnel safety,

62

particularly for platforms with fuel restrictions (e.g., aircraft)" if access to marine mammal protected areas was restricted. ECF No. 65-8, PageID #s 8461-62, 8465. This response by the Navy to the specific proposals in public comments was general and cursory, and assumed with little analysis that no restriction at all could be accommodated.

This court recognizes that its review of the FEIS is to be "highly deferential, presuming the agency action to be valid and affirming the agency action" if "the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." Thomas, 628 F.3d at 1068; Arrington, 516 F.3d at 1112. Judicial review examines whether the agency's response to public comments is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Butte, 620 F.3d at 945. Even with that recognition, this court concludes that the FEIS is deficient by reason of its repeated reliance on sweeping, absolute statements that allow for no possibility of any restriction at all.

Thus, for example, the FEIS says that limiting training and testing to specific locations would be impractical, ECF No. 65-8, PageID # 8461, as if, out of an ocean area bigger than the land mass occupied by the entire United States, it is simply not feasible to say that there is even a single square mile outside of the Humpback National Marine Sanctuary that the Navy could

possibly avoid using for any period without reducing military readiness. This cannot be anything but pure hyperbole. The Navy does not have the vessels or manpower to occupy every single square mile of the HSTT Study Area continuously, and it cannot possibly need to do so any more than the Army needs to continuously occupy every square mile of land within the United States.

Similarly, the FEIS says that "[t]raining and testing activities require continuous access to large areas consisting potentially of thousands of square miles of ocean and air space." Id. at PageID # 8462. This assertion assumes that because training may require access to large areas covering thousands of miles, the Navy must have access to millions of miles, and that even if training and testing will not occur on, say, Thanksgiving Day, access must be "continuous." No restriction of any kind is even hypothesized. Again, the breathtaking assertions allow for no limitation at all, but this makes no sense given the size of the ocean area involved.

The Navy never explains why, if it can accommodate restrictions for humpback whales, it cannot accommodate restrictions for any other species. Even if it understandably cannot avoid all contact with marine mammals, it provides no reason that the only contact it can avoid is contact with humpback whales.

Cognizant that it "is not empowered to substitute its judgment for that of the agency," see <u>Arrington</u>, 516 F.3d at 1112, the court is not presuming to set a certain number of square miles or weeks that the Navy must confine its activities to. Nor is the court selecting areas or species that the Navy must avoid entirely. But the court is saying that the Navy's categorical and sweeping statements, which allow for no compromise at all as to space, time, species, or condition, do not constitute the "hard look" required by NEPA.

## VII.      CONCLUSION.

NRDC's motion for leave to submit extra-record evidence is denied. Defendants' motion to strike is granted in part and denied in part, as noted earlier in this order.

The court grants Conservation Council's motion for summary judgment in Civil No. 13-00684 and also grants NRDC's motion for summary judgment in Civil No. 14-00153.

This order disposes of all claims and all parties in both cases. Accordingly, the Clerk of Court is directed to enter judgment in favor of Plaintiffs in both cases and to close these consolidated actions.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, March 31, 2015.



/s/ Susan Oki Mollway
Susan Oki Mollway
Chief United States District

Conservation Council for Hawaii, et al. v. National Marine Fisheries Service, et al., Civ. No. 13-00684 SOM/RLP; Natural Resources Defense Council, Inc., et al. v. National Marine Fisheries Service, et al., Civ. No. 14-00153 SOM/RLP; AMENDED ORDER GRANTING CONSERVATION COUNCIL'S MOTION FOR SUMMARY JUDGMENT, GRANTING NRDC'S MOTION FOR SUMMARY JUDGMENT, DENYING NRDC'S MOTION FOR LEAVE TO SUBMIT EXTRA-RECORD EVIDENCE, AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO STRIKE